FILED
United States Court of Appeals
Tenth Circuit

June 13, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

# TENNTH CIRCUIT

SHAUN WILKINS and ROY
BUCHNER,

Plaintiffs-Appellees,

v.

JUAN DeREYES, FRANK JACOBY,
and MICHAEL FENNER,

Defendants-Appellants.

Nos. 06-2245 and 06-2260

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO
## (D.C. NO. CIV-02-980-JH)

Sheldon Nahmod, Professor of Law, Chicago, Illinois (assisted on the briefs by
Stephen G. French and Robert W. Becker, French & Associates, P.C.,
Albuquerque, New Mexico for Appellants Jacoby and Fenner in 06-2245, and
Emily A. Franke and W. Ann Maggiore, Butt, Thornton & Baehr, P.C.,
Albuquerque, New Mexico for Appellant DeReyes in 06-2260), for Defendants-
Appellants.

Ray Twohig, Albuquerque, New Mexico, for Plaintiffs-Appellees.

Before **TACHA**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Shaun Wilkins and Roy Buchner became suspects in the 1996 investigation of a quadruple murder at a cabin in the wilderness outside of Torreon, New Mexico. Sergeant Frank Jacoby and Captain Michael Fenner, officers with the New Mexico State Police, and Detective Juan DeReyes, an officer with the Albuquerque Police Department Gang Unit, investigated the crime. As a result of the officers' investigation, Wilkins and Buchner were arrested and twice unsuccessfully prosecuted for the crimes.

In this § 1983 malicious prosecution case, Wilkins and Buchner allege the officers violated their constitutional rights by basing their arrests, and causing subsequent prosecutions, solely on false statements wrongfully coerced from fellow gang members. Concluding that factual questions exist regarding whether the officers fabricated evidence and then relied on it in arresting Plaintiffs as well as causing their prosecutions, we AFFIRM the district court's denial of qualified immunity to the officers on the malicious prosecution claim.

## I. Factual Background

Viewed in the light most favorable to Plaintiffs, *see Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997), the facts as alleged establish the following.

*Murders Connected to Gang Activity*

On April 14, 1996, Ben Anaya, Sr. discovered at his cabin the dead bodies of his son Ben Anaya, Jr., his son's girlfriend Cassandra Sedillo, and Sedillo's two children Matthew and Johnny Garcia, ages two and three. The adults had

been shot, and the children then starved to death after being locked in the cabin alone. The resulting investigation revealed the murders had taken place between December 12 and December 18, 1995.

Anaya, Jr. had been a member of the 18th Street Gang. The officers, experienced with Albuquerque gang activity, were part of a multi-unit task force investigating the murders. Their suspicion focused on Anaya's fellow gang members. In the course of their investigation, the officers brought in for questioning gang members Shawn Popeleski, Lawrence Nieto, and Plaintiffs, among others.

*Initial Interviews*

During initial interviews in April 1996, Popeleski and Nieto denied knowing who committed the murders. Disbelieving their stories, the officers brought the suspects in for further interviews. The officers pushed hard for Nieto and Popeleski to implicate Wilkins and Buchner in the quadruple homicide. DeReyes in particular had a personal interest in proving Wilkins committed the crime because "Wilkins had done a drive by shooting on his (DeReyes') house, . . . and his family was threatened by that and had to move." App. 1920. As a result of these interviews, both Nieto and Popeleski eventually implicated Plaintiffs. It is from these interrogations that the claim of fabricated and coerced testimony arises.

*Coercive Interrogations and Fabricated Evidence*

Plaintiffs contend the officers fabricated evidence by intentionally extracting matching false statements regarding Nieto's and Popeleski's knowledge of the murders and then used the statements as the sole basis for Plaintiffs' subsequent arrest and trial. They claim the officers, using threats and promises, took advantage of Nieto's and Popeleski's age (18) and Nieto's learning disabilities to persuade them to implicate Wilkins and Buchner. The officers threatened them and their families with harm, promising leniency and protection if they cooperated.

Based on these threats and promises, a series of interrogations in May 1996 yielded nearly identical statements from Nieto and Popeleski, both implicating Plaintiffs Wilkins and Buchner in the quadruple homicide.

(1) The first interrogation of Popeleski took place on May 10, 1996. Although coerced, Popeleski did not provide any useful information that day. But the very next day—and allegedly as a result of May 10 coercion—he quickly implicated Wilkins. He told the officers that Wilkins and Nieto arrived at the cabin and partied with Anaya, Sedillo, and Popeleski on the afternoon of the murders. After Wilkins and Nieto had apparently left and Anaya and Sedillo had gone to bed, Popeleski was outside when two men in ski masks surprised him. One of them held Popeleski on the ground while the other, whom Popeleski

recognized as Wilkins, went into the cabin.[1]  Popeleski heard gunshots, footsteps, and the front door being locked.  He saw the two men run back toward a car that looked like the one Wilkins and Nieto had arrived in earlier.  Popeleski tried to chase them in Anaya's jeep but lost them when the jeep stalled.

(2) After the Popeleski interviews, the officers reinterviewed Nieto on May 11, 1996, and coerced a false statement blaming Wilkins for the murders.  According to police affidavits, Nieto confessed that when Wilkins visited him shortly after the murders appeared on the news, Wilkins told him he had done "some s***" at the cabin.  Nieto did not supply any additional details.  An arrest warrant was issued for Wilkins based on this information.

(3) The officers interviewed Nieto again on May 13, 1996.  Unlike his May 11 interrogation, during which Nieto placed suspicion on Wilkins simply by relaying to the officers Wilkins's statement of doing "some s***" at the cabin, the May 13 interview produced a more detailed account.  According to Nieto's affidavit, "a lot more interrogation took place outside of that which was videotaped" on May 13.  App. 1920.

The officers allegedly forced Nieto to corroborate the story Popeleski had told them earlier, blaming both Wilkins and Buchner for the murders (although

_____

[1]  On April 15, 1996, Fenner noticed marks in the dirt outside the cabin "where it appeared someone had been running, tripped, and fell."  App. 644.  The officers argue this evidence corroborated Popeleski's statement that he was surprised from behind and ordered to the ground.  Aplt. Br. 67.

Popeleski had not yet actually mentioned Buchner).  *Id.*  ("I [Nieto] didn't think I had any choice except to go along with the story [the officers] said they knew and said Popeleski had told.  They went over it in detail, then talked to me on the videotape, then went over it again, then talked to me again on the videotape.  They put words in my mouth.  They supplied the details of the story, then when I told them something, they pressured me to change it.").  In the end, Nieto gave two statements, each differing in the details but both implicating Wilkins and Buchner, whom Nieto placed at the cabin with Wilkins.  Buchner was arrested for the murders on May 13.

(4) On May 15, 1996, Nieto was interviewed by Agent Lucero of the New Mexico state police, who is not a defendant in this case.  Plaintiffs do not contend Lucero used any coercive tactics in this interview, although they claim the statements resulted from the earlier coercive interrogations.  Moreover, according to Nieto's affidavit, right before his May 15 interview the officers "coached [Nieto] to change the [May 13] story. . . .  [He] went along with that because they pressured [him] to do so."  *Id.* at 1921.

In the interview, Nieto told Agent Lucero that Wilkins and Buchner came to his home and asked him to go to the cabin with them to party.  Wilkins had a .22 caliber pistol lying on his lap, and on the way to the cabin Wilkins and Buchner told Nieto they were going to kill Popeleski.  After spending time at the cabin, Wilkins, Buchner, and Nieto left the cabin, walked back to their car, and

-6-

donned ski masks and gloves. Nieto had a shot gun, Wilkins the pistol, and Buchner a rifle. After waiting some time, the three went back to the cabin. They saw Popeleski outside, and Wilkins told Nieto to get him. Nieto surprised Popeleski and told him to get on the ground while Wilkins and Buchner entered the cabin. When Nieto heard shots inside, he fired a shot into the air, and Popeleski ran. Wilkins and Buchner were carrying drugs and guns from the cabin and Nieto joined them as they returned to the car. Buchner went back to the cabin to lock the front door, and the three left the area together.

(5) The officers, at that point, had detailed statements from both Nieto and Popeleski, implicating Wilkins in the murders. One major difference remained, however, in that Popeleski's account deviated from Nieto's by omitting Buchner's participation. The officers went back to Popeleski to try and reconcile the two versions of what they wanted to be the same story. When Popeleski was reinterviewed on May 15, 1996, he said he had not mentioned Buchner's presence at the cabin previously because Buchner was from Corrales, and Popeleski had a friend in Corrales he was trying to protect from Buchner. The two accounts were now nearly identical in all relevant respects.

In summary, Plaintiffs contend the officers fabricated evidence by coercing Nieto and Popeleski into giving matching false statements, implicating both Wilkins and Buchner in the quadruple homicide.

*Criminal Prosecutions and Mistrials*

As a result of the investigation, Buchner and Wilkins were arrested and charged with capital murder. At Buchner's preliminary hearing on May 26, 1996, and at Wilkins's preliminary hearing on July 29, 1996, the prosecution called Popeleski to testify. He testified consistent with his May 11 and 15 statements. Nieto refused to testify on both occasions and was declared unavailable. Agent Lucero instead testified as to Nieto's May 15 statement.

Wilkins went to trial on September 22, 1997, and Buchner went to trial on November 3, 1997. Nieto and Popeleski both refused to testify at Wilkins's trial, but their prior statements were admitted. Nieto testified at Buchner's trial only to the extent of telling the jury that the interrogating officers had forced him to lie about himself and Buchner being at the cabin. Neither jury could reach a verdict and mistrials were declared.[2]

The state initially decided to retry Buchner and Wilkins, but the trial court determined that Nieto's statements would be excluded from evidence in the retrials as inadmissible hearsay. In light of the exclusions, the district attorney decided to dismiss the charges because insufficient evidence existed to go forward

---

[2] Nieto and Popeleski were also charged with the murders. Nieto testified in his own defense consistent with his May 15, 1996 statement and was convicted, receiving four consecutive life sentences. Popeleski did not testify at his trial, and was convicted of the children's murders. He received a sixteen-year sentence.

with the prosecutions. Accordingly, the district attorney dismissed the criminal cases in January and March 2001, reserving the right to retry both men.

## II. Discussion

Plaintiffs sued and alleged violations of federal civil rights, claiming the officers violated their (1) substantive due process rights by coercing matching statements from Nieto and Popeleski and using those statements against Plaintiffs,[3] and (2) Fourth Amendment rights by arresting them without probable cause, which resulted in subsequent prosecutions, a claim Plaintiffs have styled as malicious prosecution.

The officers moved for summary judgment on two grounds: (1) Plaintiffs' claims were barred by the statute of limitations, and (2) the officers were entitled to qualified immunity. In denying the motion, the district court concluded the statute of limitations did not apply, and Plaintiffs had asserted facts which, if true, would constitute a violation of a clearly established constitutional right.

### A. Statute of Limitations

A statute of limitations defense is ordinarily not appealable as part of an interlocutory qualified immunity appeal. *See Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995) (limiting pendent appellate jurisdiction to cases "where the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or where review of the nonappealable decision is necessary

---

[3] Plaintiffs do not raise a procedural due process claim. Aple. Br. 17.

to ensure meaningful review of the appealable one" (quotation marks omitted)).

*But see Rendall-Speranza v. Nassim*, 107 F.3d 913, 917 (D.C. Cir. 1997)

(choosing to exercise pendent appellate jurisdiction over the otherwise

nonappealable statute of limitations issue when, so doing, the "court may be able

to dispose of the entire case and thus to economize on the use of judicial

resources").  In this case, however, we asked the parties to file supplemental

briefing and address how, if at all, the Supreme Court decision in *Wallace v.*

*Kato*, 127 S. Ct. 1091 (2007), issued after the district court's order, affected the

statute of limitations arguments.  Following oral argument, we directed a limited

remand for the district court to reconsider the statute of limitations in light of

*Wallace*.

On remand, the district court concluded Plaintiffs' substantive due process

claim, filed August 8, 2002, was untimely and dismissed it with prejudice.  Thus,

Defendants' Motion for Exercise of Pendent Appellate Jurisdiction is denied as

moot.

With respect to Plaintiffs' malicious prosecution claim, however, the

district court relied on the favorable termination requirement (which we discuss

below) and concluded the claim had not accrued until the government dismissed

criminal charges in 2001.  Therefore, the district court found the malicious

prosecution claim was timely filed in August 2002.

As a result of the district court's disposition on remand, we need only address Plaintiffs' Fourth Amendment malicious prosecution claim in this appeal.

## B. Qualified Immunity

Turning to Plaintiffs' malicious prosecution claim, we agree with the district court that the officers are not entitled to qualified immunity.

Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). But qualified immunity is unwarranted when a plaintiff can overcome a two-part burden: plaintiff (1) "must . . . establish that the defendant violated a constitutional right" and (2) "must then show that the constitutional right was clearly established," such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc).

"Orders denying qualified immunity before trial are appealable to the extent they resolve abstract issues of law." *Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997) (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)); *accord Johnson v. Jones*, 515 U.S. 304, 312–14 (1995); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001). But at the interlocutory appeal stage, we have no jurisdiction to review the district court's rulings based on the sufficiency of the evidence—"which facts a party may, or may not, be able to prove at trial." *Medina*, 252 F.3d at 1130 (quoting

*Johnson*, 515 U.S. at 313–18). We may review only whether "under [Plaintiffs'] version of the facts, [Defendants] violated clearly established law. In making this determination, we must scrupulously avoid second-guessing the district court's determinations regarding whether [Plaintiffs have] presented *evidence* sufficient to survive summary judgment." *Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997). "[W]here the district court makes a legal finding and states specific facts upon which that finding is based, we do not have jurisdiction to delve behind the ruling and review the record to determine if the district court correctly interpreted those facts to find a genuine dispute." *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1259 (10th Cir. 1998).

Under this framework, to establish a constitutional violation Plaintiffs must assert facts meeting the elements of a § 1983 malicious prosecution claim. In this case, Plaintiffs argue the officers violated their Fourth Amendment rights by arresting them without probable cause, which led to lengthy detentions while Plaintiffs were being prosecuted. If so, they argue any reasonable police officer would know the law clearly established such conduct as unlawful.

At this stage of the case, construing the facts in favor of Plaintiffs, our review is limited to two purely legal issues: (1) whether the alleged facts, if true, amount to a constitutional violation, and (2) whether the alleged constitutional violation was clearly established at the time of the challenged action. *See Cortez*, 478 F.3d at 1114. Analyzing these two issues, we conclude the district court

-12-

correctly denied the officers qualified immunity on Plaintiffs' malicious prosecution claim.

### 1. Constitutional Violation

The common law elements of malicious prosecution are the "starting point" for our analysis of a § 1983 malicious prosecution claims. *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–86 (10th Cir. 2004). But "the ultimate question" in such a case "is whether plaintiff has proven the deprivation of a constitutional right." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257–58 (10th Cir. 2007) (citing *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)); *see also Pierce*, 359 F.3d at 1288. Because Plaintiffs premised their § 1983 malicious prosecution claim on a violation of the Fourth Amendment right to be free from unreasonable seizures, we analyze the elements of their claim in light of Fourth Amendment guarantees.[4]

---

[4] Our cases suggest a § 1983 malicious prosecution claim need not always rest on the right to be free from unreasonable searches and seizures under the Fourth Amendment. As we have previously noted, a plaintiff's § 1983 malicious prosecution claim may also encompass procedural due process violations. *Pierce*, 359 F.3d at 1285–86 ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause."); *see generally* 1 Wayne R. LaFave et al., *Criminal Procedure* § 2.7(a)–(c) (3d ed. 2007) (describing numerous procedural due process guarantees that apply during the investigatory, charging, pretrial, trial, and sentencing stages). *But see Mondragon v. Thompson*, 519 F.3d 1078, 1083 n.5 (10th Cir. 2008) ("[A]dditional requirements, such as the [absence] of adequate state law remedies, might apply to a procedural due process claim.") (citing *Becker v. Kroll*, 494 F.3d 904, 917–22 (10th Cir. 2007)); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by

(continued...)

Unlike a false arrest or false imprisonment claim, malicious prosecution

concerns detention only "[a]fter the institution of legal process." *Mondragon v.*

*Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008); *see also Wallace v. Kato*, 127

S. Ct. 1091, 1096 (2007) ("[A]fter [institution of legal process], unlawful

detention forms part of the damages for the . . . tort of malicious prosecution,

which remedies detention accompanied not by absence of legal process, but by

*wrongful institution* of legal process."). In this context, a Fourth Amendment

violation can exist only when a plaintiff alleges the legal process itself to be

wrongful. If a plaintiff challenges merely the confinement *after* the institution of

legal process, but not the process itself, "[t]he protections offered by the Fourth

Amendment do not apply." *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir.

2000); *see also Taylor v. Waters*, 81 F.3d 429, 436 (4th Cir. 1996)

("[D]etermination of probable cause by detached judicial officer that complies

with Fourth Amendment constitutes all of the process due in order to

---

[4](...continued)
government agents before or during trial, a defendant who is acquitted cannot be
said to have been deprived of the [procedural due process] right to a fair trial.").
In this case, Plaintiffs have disavowed any claim they may have based on
procedural due process. Aple. Br. 17.

Other "explicit constitutional right[s]" could also conceivably support a
§ 1983 malicious prosecution cause of action, *see* Michael Avery et al., *Police
Misconduct: Law and Litigation* § 2:14 & n.5 (2007 Westlaw; POLICEMISC
database) (collecting cases), although the Supreme Court specifically excluded
substantive due process as the basis for a malicious prosecution claim. *Albright
v. Oliver*, 510 U.S. 266, 274–75 (1994). Here, Plaintiffs have not alleged any
other constitutional violation in support of their malicious prosecution theory.

constitutionally detain an accused pending trial.") (citing *Baker v. McCollan*, 443 U.S. 137, 142–46 (1979)).

Depending on the circumstances of the arrest, a plaintiff can challenge the institution of legal process as wrongful in one of two ways. If arrested without a warrant—and thus triggering "the Fourth Amendment require[ment of] a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest," *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)—a plaintiff can challenge the probable cause determination made during the constitutionally-required probable cause hearing. *See, e.g.*, *Reed v. City of Chicago*, 77 F.3d 1049, 1053–54 (7th Cir. 1996) (concluding the plaintiff failed to state a malicious prosecution claim when he challenged only the warrantless arrest, but not the subsequent institution of legal process). Or, if arrested pursuant to a warrant, plaintiff can challenge the probable cause determination supporting the warrant's issuance. *See, e.g.*, *Meacham*, 82 F.3d at 1562 (analyzing the Fourth Amendment malicious prosecution claim "that the affidavit prepared . . . in support of the arrest warrant contained deliberately false statements and omissions, thereby misleading the judge into issuing the arrest warrant"). Either way, the allegation would state a Fourth Amendment violation sufficient to support a § 1983 malicious prosecution cause of action.[5]

---

[5] Because a person unlawfully arrested without legal process can bring a Fourth Amendment claim sounding in false imprisonment, *Wallace*, 127 S. Ct. at

(continued...)

In this case, Plaintiffs were detained pursuant to arrest warrants. At common law, the issuance of an arrest warrant represents a classic example of the institution of legal process. *See* Restatement (Second) of Torts § 654 cmt. c (1977) ("Criminal proceedings are usually instituted by the issuance of some form of process, *generally a warrant for arrest*, the purpose of which is to bring the accused before a magistrate in order for him to determine whether the accused shall be bound over for further action by a grand jury or for trial by a court." (emphasis added)). Plaintiffs' detention was thus preceded by the institution of legal process, triggering the malicious prosecution cause of action. *See* Michael Avery et al., *Police Misconduct: Law and Litigation* § 2:10 (2007 Westlaw; POLICEMISC database) ("The Supreme Court's analysis in *Wallace* . . . indicates that such claims should not be characterized as false arrest or false imprisonment, because detention of the subject is pursuant to legal process."). In challenging that process by alleging the officers knowingly supplied false information in affidavits for the warrants, Plaintiffs based their malicious prosecution claim on the Fourth Amendment right against unreasonable seizures.

---

[5](...continued) 1095, the malicious prosecution framework in a sense allows a second Fourth Amendment claim to come on the heels of the first one. *Mondragon*, 519 F.3d at 1083 n.4 (noting, in a case dealing with a forged arrest warrant, "[w]e do not foreclose the additional, though unlikely, possibility of a second Fourth Amendment claim, arising after the first one ends" (citing *Wallace*, 127 S. Ct. at 1096 n.2)). But because the institution of legal process separates the two claims—and thus makes them legally distinct—we think the two claims, though grounded in the same constitutional provision, can coexist.

-16-

Under our cases, a § 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Novitsky*, 491 F.3d at 1258 (citing *Pierce*, 359 F.3d at 1291–97). In Plaintiffs' case, the third element deals only with the probable cause determination during the institution of legal process—in other words, with the applications for arrest warrants. This link supplies the necessary connection between the malicious prosecution cause of action and Plaintiffs' Fourth Amendment allegations.

With the above in mind, we first examine whether fact questions limit our review of the alleged constitutional violation, *see Sevier v. City of Lawrence*, 60 F.3d 695, 701 (10th Cir. 1995), and then turn to whether the officers are entitled to qualified immunity as a matter of law.

### a. Existence of Fact Questions as to Malice

Reviewing the officers' motion for summary judgment, the district court determined Plaintiffs presented sufficient evidence to create a fact question as to whether the officers fabricated evidence to arrest and prosecute them. In finding a factual basis for the theory that the officers coerced false testimony, the court pointed to the following evidence: Nieto's and Popeleski's susceptibility to the

tactics employed in the interrogations because of their age and lack of education; other circumstances of the interrogations; and numerous statements by the officers, at times threatening harm to Nieto and Popeleski or their families and at other times promising help and safety.

Taking these allegations as a whole, the district court found the evidence "viewed in the light most favorable to the Plaintiffs, implied [DeReyes] wanted to pin the murders on Wilkins . . . and that the only way for Nieto to help himself was to say that Wilkins was involved." App. 2902. The district court also found the evidence in the light most favorable to Plaintiffs established Popeleski's statements were similarly coerced by "egregious . . . promises of help and safety, as well as the threats of harm." *Id.* at 2906. Finally, the district court found a factual dispute regarding whether the officers acted recklessly or intentionally in coercing false statements.

The officers responded that even under the totality of the circumstances, they never made threats or promises "sufficiently compelling and linked to the confession so that it could be said that [Nieto's and Popeleski's] will[s were] overcome by the offer[s]." *Clanton*, 129 F.3d at 1159. But the district court found "a fact issue exists as to whether Defendants coerced statements from Nieto and Popeleski," App. 2915, and here we must defer to the district court's expertise in determining "the existence, or nonexistence, of a triable issue of fact." *Johnson*, 515 U.S. at 316.

-18-

We thus will not review the district court's conclusion that on this record coercion presents a disputed factual issue. We took the same approach in *Clanton* where we determined "coercion is a factual issue that must be evaluated on the entire record" and decided the district court's determination that the plaintiff had presented evidence of coercion was "sufficient to preclude our review on interlocutory appeal." 129 F.3d at 1159; *see also Johnson*, 515 U.S. at 316 (noting that reviewing factual disputes on interlocutory appeal would "require reading a vast pretrial record" and cause undue delay). The issues Plaintiffs present with regard to the allegedly coerced statements are sufficiently fact-oriented—requiring an analysis of the meaning and purpose of the officers' statements to Nieto and Popeleski—to prevent us from exercising jurisdiction over the district court's sufficiency of evidence determination on interlocutory appeal.

In addition, whether Plaintiffs have presented sufficient evidence of fabricated testimony bears on Plaintiffs' malicious prosecution claim because, as the district court explained,

> If those statements were indeed involuntary, then the officers who carried out the alleged coercion could not reasonably rest their determination of probable cause upon those statements. On the other hand, if Defendants did not coerce the statements from the witnesses, then it would be proper for Defendants to . . . base their determination of probable cause on those statements.

App. 2915. For purposes of the malicious prosecution claim, then, disputed factual issues remain not only whether Nieto's and Popeleski's statements were involuntary and false, but also whether a reasonable officer would have known so.

We acknowledge the officers' contention that, even if Nieto's and Popeleski's statements were in fact coerced, the officers could reasonably, though mistakenly, have concluded those confessions constituted reliable evidence for purposes of probable cause. Qualified immunity of course "operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). The district court, however, specifically found Plaintiffs had presented sufficient evidence to show the officers recklessly or intentionally coerced *false* statements, and we cannot review this evidentiary conclusion on appeal. If the officers acted intentionally or recklessly to fabricate evidence, they plainly are not entitled to a qualified immunity defense based on a reasonable mistake.

Because we may not review the district court's evaluation of the factual issues surrounding coercion, we accept for purposes of this appeal that Nieto's and Popeleski's statements were involuntary and false and that the officers knew so.

## b.  Questions of Law Regarding the Elements of Malicious Prosecution

We have already concluded that fact issues remain regarding whether the officers knowingly relied on false evidence, and, accordingly, we must assume Plaintiffs can meet the malice element of their malicious prosecution claim.  The only other arguments the officers raise are (1) whether, as a matter of law, excluding the fabricated testimony would vitiate probable cause, and (2) whether the prosecution was favorably terminated as to Plaintiffs.[6]  We agree with the district court that without the coerced statements, the officers lacked probable cause to arrest Plaintiffs and cause their subsequent detentions and prosecutions.  We also agree the prosecutions were favorably terminated.

---

[6]  Plaintiffs argue we need not consider the favorable termination element on appeal.  They argue we instead need focus only on whether Plaintiffs have shown an absence of probable cause.  We disagree.  The Supreme Court in *Heck v. Humphrey*, 512 U.S. 477, 484–86 (1994), described favorable termination as an essential element of a malicious prosecution action under § 1983, since the common law immunities and limits serve important purposes inherent in § 1983 actions, namely to prevent conflicting resolution of the probable cause assessment.  And although the Court later clarified that the *Heck* favorable termination requirement does not apply to false arrest claims in the absence of an existing conviction, *Wallace*, 127 S. Ct. at 1097–98, the requirement remains an essential element of a § 1983 claim sounding in malicious prosecution.  Thus, the Supreme Court continues to instruct that to survive qualified immunity, a plaintiff must allege a constitutional violation, including, in a malicious prosecution case, favorable termination.

*The Absence of Probable Cause*

"Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). In the affidavits supporting warrants to arrest Plaintiffs, the officers relied entirely on the allegedly coerced false statements of Nieto and Popeleski. App. 600–03 (Wilkins), 610–13 (Buchner). Thus, if we set aside, as we must, the false information, *Pierce*, 359 F.3d at 1294–95, nothing is left in the affidavits to support probable cause for Plaintiffs' arrests.

The officers argue they had probable cause even without the allegedly coerced confessions. In support, they point to the following additional evidence: (1) Wilkins owned a .22 caliber handgun, the same caliber used in the murders; (2) Buchner made callous remarks about the victims, specifically that he "did not give a f\*\*\* about the kids," App. 429; (3) a polygraph of Popeleski indicated he was deceptive when he said he was not present at the killings and did not know who the killer was; (4) a polygraph of Nieto indicated he was truthful when he denied shooting the victims; (5) a polygraph of Wilkins indicated he was deceptive when he said he did not shoot Anaya; and (6) the interview conducted

by Lucero after the allegedly coercive interrogations confirmed Nieto's and Popeleski's earlier statements implicating Plaintiffs.[7]

But because the officers revealed none of the additional information during the institution of legal process—in this case, during the arrest warrant applications—the officers cannot use this information to escape liability. If institution of legal process is required to trigger a malicious prosecution claim, we ought not search for probable cause in a pile of unrevealed information. The Fourth Amendment in the context of a malicious prosecution claim deals with *judicial determinations* of probable cause, either at the warrant application stage or during a *Gerstein* hearing following a warrantless arrest. Judicial determination becomes a misnomer if information required to support probable cause remains at all times firmly lodged in the officer's head. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971) ("[A]n otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. . . . A contrary rule would, of course, render the [legal process] requirements of the Fourth Amendment meaningless.").

---

[7] Evidence that Nieto's and Popeleski's statements were consistent with each other's statements and their polygraphs does not contribute to probable cause if, as Plaintiffs allege, the officers coerced Nieto and Popeleski into giving matching false statements. Similarly, marks in the dirt outside the cabin corroborating the allegedly coerced statements do not contribute to probable cause because the marks have no meaning without the statements.

To be sure, Agent Lucero did testify weeks later at Plaintiffs' preliminary hearings consistent with his May 15 interview of Nieto. But even if this interview were sufficiently attenuated from the allegedly coercive interrogations a couple of days earlier (which we doubt), Lucero's testimony would at most limit Plaintiffs' damages by breaking the chain of causation between the Fourth Amendment violations and subsequent confinements. *See Meacham*, 82 F.3d at 1564 (citing *Reed*, 77 F.3d at 1049, to explain that a preliminary hearing conducted after the institution of legal process can break the causal chain). And in any event, deciding this case at the qualified immunity stage, we have no jurisdiction to address any causation issues.

Thus, Plaintiffs' allegations, if proven, satisfy the absence of probable cause element of their malicious prosecution claim.

*Favorable Termination*

The district attorney dismissed charges against Wilkins and Buchner by filing *nolle proseques* in early 2001.[8] "Criminal proceedings are terminated in favor of the accused by the formal abandonment of the proceedings by the public prosecutor." Restatement (Second) of Torts § 659(c) (1977). But abandonment of the proceedings is ordinarily insufficient to constitute a favorable termination

_____

[8] A *nolle prosequi* represents a "legal notice that a . . . prosecution has been abandoned." *Black's Law Dictionary* 1074 (8th ed. 2004); *see also Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997) ("A *nolle prosequi* is not a final disposition of a case but is a procedure which restores the matter to the same state which existed before the Government initiated the prosecution.").

if "the prosecution [is] abandoned pursuant to an agreement of compromise with the accused; . . . because of misconduct on the part of the accused . . . ; [or] out of mercy requested or accepted by the accused." *Id.* § 660.[9] These reasons for withdrawal of a charge do not necessarily constitute favorable terminations because they do not "indicate the innocence of the accused" or are at least "consistent with guilt." *Id.* cmt. a.

On the other hand, the inability of a prosecutor to prove a case beyond a reasonable doubt at trial can be consistent with the innocence of the accused and can be deemed a favorable termination in favor of the accused. *Id.* cmt. d. Concluding a case cannot be proven beyond a reasonable doubt, a prosecutor might withdraw a criminal charge. One way to do this is to abandon or suspend a prosecution by "enter[ing] a nolle prosequi after an indictment has been found." *Id.* cmt. b.

---

[9] In full, Section 660 reads:

> A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if
> (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused; or
> (b) the charge is withdrawn or the prosecution abandoned because of misconduct on the part of the accused or in his behalf for the purpose of preventing proper trial; or
> (c) the charge is withdrawn or the proceeding abandoned out of mercy requested or accepted by the accused; or
> (d) new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused.

To decide whether a *nolle prosequi* constitutes a favorable termination, we look to the stated reasons for the dismissal as well as to the circumstances surrounding it in an attempt to determine whether the dismissal indicates the accused's innocence.  *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) ("To determine whether the proceedings against [the defendant] were terminated in his favor, we must look past the form or title of the disposition and examine the circumstances surrounding the entry of the *nolle prosequi*.").  "The plaintiff has the burden of proving a favorable termination."  *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997).  To that end, a "bare nolle prosse without more is not indicative of innocence."  *Id.* at 558.  The "dispositive inquiry is whether the failure to proceed implies a lack of reasonable grounds for the prosecution."  *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997) (internal quotations and brackets omitted).[10]

In the circumstances here, the *nolle proseques* should be considered terminations in favor of Plaintiffs.  The dismissals were not entered due to any compromise or plea for mercy by either Wilkins or Buchner.  Rather, they were the result of a judgment by the prosecutor that the case could not be proven beyond a reasonable doubt.  App. 1053 (Buchner), 1056 (Wilkins) ("[I]t is the

---

[10]  In one case, a court has concluded the stated reasons for the *nolle proseques* precluded an inference of a favorable termination.  *See Donahue v. Gavin*, 280 F.3d 371, 384 (3d Cir. 2002) (concluding the *nolle proseques* did not indicate innocence when the "prosecutor simply reasoned that Donahue was not likely to receive any additional jail time if convicted in a retrial").

State's opinion that currently there is insufficient evidence upon which to retry the defendant[s] for these crimes.").

Nor can we conclude Wilkins and Buchner engaged in prohibited misconduct when they successfully moved to exclude Nieto's May 15 interview as hearsay. To be sure, "[a]mong the types of misconduct on the part of the accused" that turn the resultant *nolle proseques* into unfavorable terminations is "the suppression of evidence . . . that prevents a fair hearing of the cause." Restatement § 660 cmt. d. "Since lumped together with other 'misconduct' of the accused, this reference to suppression of evidence apparently refers to the hiding of evidence by the accused, *not suppression of evidence in accordance with an evidentiary ruling.*" *Dobiecki v. Palacios*, 829 F. Supp. 229, 235 (N.D. Ill. 1993) (emphasis added).

Such an understanding takes into account the Restatement's clarification that "[n]ot included [in the definition of misconduct] are claims of constitutional or other privilege . . . and similar conduct that merely forces the state to prove its case beyond a reasonable doubt in a trial otherwise fair and proper." Restatement § 660 cmt. d; *Dobiecki*, 829 F. Supp. at 235. Under this formulation, "[i]f the circumstances show that unreliable evidence has been suppressed and the prosecution then abandons the case because of lack of sufficient reliable evidence, that would be a circumstance where the dismissal is indicative of innocence." *Dobiecki*, 829 F. Supp. at 235. But "if the evidence was only

-27-

suppressed on 'technical' grounds having no or little relation to the evidence's trustworthiness, then the fact that there was not other sufficient evidence would not be indicative of innocence." *Id.* at 235–36.

The suppressions in Wilkins's and Buchner's criminal cases excluded unreliable evidence not falling within any of the exceptions. App. 1002–32. These were not instances of hiding otherwise perfectly reliable evidence. *See Dobiecki*, 829 F. Supp. at 235–36 (concluding the termination not favorable when defendant moved to suppress "a custodial confession . . . obtained without the benefit of *Miranda* warnings," a purely "prophylactic [dismissal] on 'technical' grounds having no or little relation to the evidence's trustworthiness"); *Miller v. Cuccia*, 201 F.3d 431, 431 (2d Cir. 1999) (unpublished disposition) ("The suppression of the inculpatory evidence does not establish or imply appellant's innocence because it was not related to or based upon the reliability or unreliability of the evidence."). To the contrary, far from moving to exclude evidence on a mere technicality unrelated to the evidence's reliability, Wilkins and Buchner forced the district attorney to prove their guilt without using unreliable evidence. The district attorney, having concluded that without the excluded testimony he could not prove the charged crimes beyond a reasonable doubt, dismissed the charges.

In this case, therefore, insufficient evidence to convict Plaintiffs is consistent with favorable termination. In other words, we can infer innocence

-28-

from both the stated reasons for the *nolle proseques* and the surrounding circumstances. Accordingly, we agree with the district court that Plaintiffs satisfied the favorable termination requirement of their malicious prosecution claim.

* * *

In sum, the alleged facts establish the elements of the constitutional tort of malicious prosecution.

### 2. *Clearly Established*

We now turn to whether the law regarding the alleged constitutional violation was clearly established. If it was not, qualified immunity applies.

The constitutional right Plaintiffs allege was violated was clearly established if the "contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* "For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as plaintiff maintains." *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997). "[T]he salient question . . . is whether the state of the law [at the time of the

conduct] gave [Defendants] fair warning that their alleged treatment of [Plaintiffs] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

If the officers intentionally coerced false statements from Nieto and Popeleski, the law clearly prohibited the use of those statements to seek warrants for Plaintiffs' arrests. Thus, if the officers acted as Plaintiffs allege, they had fair warning their treatment of Plaintiffs beginning in May 1996 was unconstitutional.

First, it was clearly established that false evidence cannot contribute to a finding of probable cause. Probable cause depends on "reasonably trustworthy information." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The Supreme Court has held it is a violation of the Fourth Amendment to "'knowingly, or with reckless disregard for the truth,' include false statements in the affidavit" outlining probable cause for an arrest. *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)); *accord Stewart v. Donges*, 915 F.2d 572, 581–82 (10th Cir. 1990).

Where false statements have been relied on to establish probable cause, "the existence of probable cause [for § 1983 purposes] is determined by setting aside the false information." *Wolford*, 78 F.3d at 489; *accord Pierce*, 359 F.3d at 1294–95. Thus, if Plaintiffs' allegations are true, the officers obviously could not rely on fabricated evidence in evaluating whether probable cause existed to arrest and prosecute Plaintiffs. And as we have already explained, without the coerced confessions, the officers lacked probable cause.

Second, it of course has long been clearly established that knowingly arresting a defendant without probable cause, leading to the defendant's subsequent confinement and prosecution, violates the Fourth Amendment's proscription against unreasonable searches and seizures. *E.g. Meacham*, 82 F.3d at 1561 (citing *Albright v. Oliver*, 510 U.S. 266 (1994), and holding one constitutional right protected by § 1983 malicious prosecution claims "is the Fourth Amendment's right to be free from unreasonable seizures"); *see also*, *e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("[T]he Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.").

* * *

Thus, Plaintiffs have presented facts that, if true, constitute a violation of the Fourth Amendment. Without the allegedly fabricated statements, the officers did not present information from which a detached magistrate could conclude probable cause existed to justify continued detention. Under the version of facts presented by Plaintiffs and accepted by the district court on summary judgment, the officers intentionally coerced matching false statements, and a reasonable officer should have known no probable cause existed without the statements.

The officers are therefore not entitled to qualified immunity on the malicious prosecution claim.

### III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court denying the officers qualified immunity for Plaintiffs' malicious prosecution claim.