FILED
United States Court of Appeals
Tenth Circuit

December 20, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SPERO PANAGOULAKOS,

     Plaintiff - Appellee,

v.

PATRICIA YAZZIE, Albuquerque
Police Department Officer,

     Defendant - Appellant.

No. 13-2003

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:11-CV-00381-KBM-WDS)**

---

Paul M. Cash, Assistant City Attorney, (Stephanie M. Griffin, Assistant City
Attorney, with him on the briefs), City of Albuquerque Legal Department,
Albuquerque, New Mexico, for Defendant-Appellant, Patricia Yazzie.

Colin L. Hunter, (Chris P. Collins and Jason Bowles with him on the brief),
Attorneys at Law, Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **HOLLOWAY** and **HOLMES**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

Defendant Officer Patricia Yazzie appeals the district court's denial of

qualified immunity in this § 1983 action alleging wrongful arrest and imprisonment (Count I) and illegal seizure of property (Count II).  This is an interlocutory appeal following the district court's ruling in an action brought by Spero Panagoulakos pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1343.  The "district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291."  Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).  We reverse.

# I
## *Factual Background*

On the afternoon of July 8, 2010, Panagoulakos went for a drive in a pickup truck.  The truck's temporary registration tag was too faded to read, which prompted Lieutenant Ricardo Galindo to pull Panagoulakos over.  While Lieutenant Galindo made initial inquiries of Panagoulakos, Panagoulakos volunteered that he had a firearm in the vehicle.  Lieutenant Galindo then walked back to his car and ran a few routine checks, which included checking the National Crime Information Center (NCIC) database.  The NCIC report received stated:

> ****WARNING - THE FOLLOWING IS AN NCIC PROTECTION ORDER RECORD. DO NOT SEARCH, DETAIN, OR ARREST BASED SOLELY ON THIS RECORD.  CONTACT ENTERING AGENCY TO CONFIRM STATUS AND TERMS OF PROTECTION ORDER*****

****THE SUBJECT OF THIS RECORD IS PROHIBITED FROM
RECEIVING OR POSSESSING A FIREARM UNDER FEDERAL
LAW (TITLE 18, U.S.C., SECTION 922)****

Aplt. App. at 100. When Panagoulakos was alerted to this development, he admitted that he was subject to a protective order, but he insisted that the judge had given him special permission to carry a firearm. Indeed, he claimed that the protective order contained an express provision to that effect.

At this point, Lieutenant Galindo radioed for another officer to assist at the scene. Then he contacted "county warrants," which verified that the protective order was valid. And he also called Domestic Violence Sergeant Paul Szyche, who confirmed that arresting Panagoulakos under these circumstances would be consistent with Albuquerque Police Department policy. By the time Officer Yazzie arrived on the scene, Panagoulakos was in handcuffs. Lieutenant Galindo briefed Officer Yazzie on the situation and instructed her to take Panagoulakos to the substation. There, Officer Yazzie was to confirm that the protective order was valid and that it did not contain the exception Panagoulakos claimed.

Officer Yazzie believed, incorrectly, that all orders of protection prohibit possession of a firearm. As it turns out, the subject of a protective order is forbidden from possessing firearms by 18 U.S.C. § 922(g) only when classified as an "intimate partner." After Officer Yazzie obtained a copy of the protective order and reviewed it, she found no exception which would permit the possession of a firearm. She then prepared a criminal complaint and had Panagoulakos

3

detained.

### *The Protective Order*

On the first page of the protective order, Panagoulakos's relationship to the

protected party is listed as "ex-boyfriend." Id. at 106. At the bottom of the page,

it reads:

> As a result of this order, it may be unlawful for you to possess or purchase ammunition or a firearm, including a rifle, pistol or revolver, under 18 U.S.C. Section 922(g)(8). If you have any questions whether federal law makes it illegal for you to possess or purchase a firearm, you should consult an attorney.

Id. On the second page, near the top, it reads:

> 1.     NOTICE, APPEARANCES AND STATUS
>
> This order was entered on stipulation of the parties.
> [ ] The relationship of the parties is that of an "intimate partner" as defined in 18 U.S.C. Section 921(a)(32). *(See 2 below*)
>
> 2.     EFFECT OF STIPULATION TO ORDER OF PROTECTION
>
> Violation of this order can have serious consequences, including:
> A.     . . .
> B.     If you are the spouse or former spouse of the other party, an individual who cohabitates with or has cohabitated with the other party, or if you and the other party have had a child together, federal law prohibits you from possessing or transporting firearms or ammunition while this order is in effect. If you have a firearm or ammunition, you should immediately dispose of the firearm or ammunition. Violation of this law is a federal crime punishable by imprisonment for up to ten (10) years and a fine of up to two hundred fifty-thousand dollars ($250,000).

4

Id. at 107.  The "intimate partner" box is unchecked.  Id.

### *Procedural History*

When Panagoulakos filed this suit on May 5, 2011, he named as defendants Officer Yazzie, Officer John Doyle,[1] Lieutenant Galindo, and the City of Albuquerque.  Under § 1983, Panagoulakos alleged violations of his Fourth and Fourteenth Amendment rights against wrongful arrest and false imprisonment (Count I), and illegal seizure of his property (Count II).  He also alleged violation of his due process rights (Count III), and as regards the City of Albuquerque, he alleged a negligent hiring, training, and retention claim (Count IV).

Defendants moved for summary judgment on all claims, and Panagoulakos also moved for partial summary judgment on his Fourth and Fourteenth Amendment claims.  As is relevant here, the district court held that Officer Yazzie was entitled to qualified immunity for the initial arrest and seizure of property because the initial arrest was supported by probable cause.  But the court denied qualified immunity as to claims arising out of Panagoulakos's continued detention after Officer Yazzie had the opportunity to review the protective order.  The court concluded that Officer Yazzie no longer had probable cause to continue the detention after she reviewed the protective order, and that her continued

---

[1] Officer Doyle assisted Officer Yazzie at the substation, and he physically transported Panagoulakos to jail after Officer Yazzie had examined the protective order and prepared the criminal complaint.  Aplt. App. at 159.

detention of Panagoulakos was a "mistake" that was "unreasonable in view of applicable law and the facts known at the time." Aplt. App. at 207.

## II
### *Standard of Review*

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) (internal quotation marks omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." Courtney v. Okla. ex rel., Dep't of Pub. Safety, 722 F.3d 1216, 1222 (10th Cir. 2013) (internal quotation marks omitted). We have discretion to address either prong first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). As the "clearly established" prong resolves this case, we begin with it.

### *Clearly Established*

"For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Wilson v. Montano, 715 F.3d 847, 852 (10th Cir. 2013) (alteration omitted) (internal quotation marks omitted). As a result, "for a right to be clearly established, there must be a Supreme Court or

6

Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Cortez, 478 F.3d at 1114-15. Notably, "an unpublished opinion provides little support for the notion that the law is clearly established on a given point." Morris v. Noe, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012) (internal quotation marks omitted).

All roads lead to the same conclusion in this case; we need address only one. Even assuming *arguendo* that clearly established law demonstrated that Officer Yazzie no longer had probable cause to detain Panagoulakos after her review of the protective order (a conclusion to which we do not subscribe[2]), Panagoulakos would still bear the burden of showing that clearly established law imposed a duty on Officer Yazzie to release him. In other words, Panagoulakos must show that, even though probable cause supported his initial arrest, clearly established law gave fair warning to Officer Yazzie that following her review of the protective order it was her constitutional duty to release him.

There is only one standard to which the parties point that could impose such a duty. In Thompson v. Olson, the First Circuit held that "following a legal warrantless arrest based on probable cause, an affirmative duty to release arises only if the arresting officer ascertains beyond a reasonable doubt that the

---

[2] Nor, apparently, does Panagoulakos. See Aplee. Br. at 12 ("The Tenth Circuit has not adopted a test to determine when probable cause has dissipated.").

7

suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded."[3]  798 F.2d 552, 556 (1st Cir. 1986).  For Panagoulakos to prevail, the Tenth Circuit must have adopted the Thompson standard, and it must be clearly established that the Thompson standard required his release under these facts. See Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2084 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality." (citation omitted)).

Quite to the contrary, we have never applied the Thompson standard in a published opinion.  We cited the case in Romero v. Fay, 45 F.3d 1472, 1478 n.3, 1480 n.6 (10th Cir. 1995), but we did not adopt its test.[4]  The only case in which we mentioned the standard is the unpublished case of Titus v. Ahlm, 297 F. App'x 796, 801 (10th Cir. 2008) (unpublished).  But not only does a single unpublished opinion "provide[] little support for the notion that the law is clearly established," Morris, 672 F.3d at 1197 n.5, also the facts of Titus are inapposite. In that case, Officer Ahlm arrested Titus for DWI after he struggled to satisfactorily perform sobriety tests and refused to take a breath alcohol test during the stop.  Titus, 297 F. App'x at 798-99.  At the station, Titus acquiesced to a breath test from a "calibrated and certified machine," which registered that

---

[3] The court derived its test from the Restatement (Second) of Torts § 134 cmt. f (1965).  See Thompson, 798 F.3d at 556.

[4] Indeed, Panagoulakos concedes this point.  See Aplee. Br. at 15 ("Romero did not adopt the 'beyond any reasonable doubt' test.").

8

Titus had a .02% blood alcohol level.  Id. at 799.  This reading was too low to support a conviction of DWI in New Mexico, but high enough to be charged with "driving while impaired to the slightest degree."  Id. at 799 n.1, 800.  Citing Thompson, we concluded that Officer Ahlm had no affirmative duty to release Titus, because the breath test was inculpatory; the test results supported probable cause that Titus was driving while impaired to the slightest degree.  Id. at 800-01.  Here, by contrast, Panagoulakos contends that the protective order negated probable cause.  Thus, even if Titus could be said to have adopted the Thompson standard, its facts provide meager support for the proposition that the law clearly established a duty to release under circumstances like those confronted by Officer Yazzie.

Nor has the "clearly established weight of authority from other courts" imposed a duty to release under these circumstances.  Cortez, 478 F.3d at 1114-15 (internal quotation marks omitted).  A handful of other courts have adopted some form of the Thompson standard.  See, e.g., Duckett v. City of Cedar Park, Tex., 950 F.2d 272, 279 (5th Cir. 1992) (applying Thompson and extending it to constitutional claims); Babers v. City of Tallassee, Ala., 152 F. Supp. 2d 1298, 1308-09 (M.D. Ala. 2001) (adopting Thompson and extending it to constitutional claims); Ruttan v. Bd. of Comm'rs of Johnson Cnty., Kan., 2000 WL 1114961, at *5 (D. Kan. 2000) ("Several federal courts have held that, unless it becomes exceedingly clear that probable cause no longer exists, a law enforcement officer

9

does not have an affirmative duty to release a detainee who was arrested based on probable cause.").  But those courts do not represent the "clearly established weight of authority of other courts."  Cortez, 478 F.3d at 1114-15 (internal quotation marks omitted).  The majority of courts have never imposed such a duty, much less under circumstances similar enough to make "the contours of the right . . . sufficiently clear that a reasonable official" in Officer Yazzie's position would understand that her actions violated that right.  See Wilson, 715 F.3d at 852 (alteration omitted) (internal quotation marks omitted).

In short, Officer Yazzie is entitled to qualified immunity because no clearly established law imposed on her a duty to release Panagoulakos following his lawful arrest after the traffic stop.

REVERSED.

13-2003, *Panagoulakos v. Yazzie*

**HOLLOWAY**, Circuit Judge, dissenting:

It is clear, in my view, that there was no probable cause for Officer Yazzie to file a criminal complaint against Mr. Panagoulakos, the Plaintiff, after Officer Yazzie had reviewed the protective order which she quite mistakenly believed provided such probable cause.[1] The majority's holding that the officer is entitled to qualified immunity for her mistake of law is contrary to our precedents, most notably *Courtney v. Oklahoma*, 722 F.3d 1216, 1223 (10th Cir. 2013). Accordingly, I respectfully dissent.

Our Constitution protects against unreasonable seizures of our persons. An arrest is valid if the arresting officer has probable cause to believe that a crime has been committed. In the absence of probable cause, detention is not permitted except for a reasonably brief period allowed for investigation when an officer has reasonable suspicion that an offense has been committed. *See, e.g., United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc). Moreover, it is inherent in the nature of investigative detentions that officers will learn additional information, information which either may bolster or may weaken the basis for the officer's suspicion that an offense has been committed. And our precedents

---

[1] Without any explanation, the majority says that this is a conclusion "to which we do not subscribe." The majority even purports to detect that Mr. Panagoulakos has expressed agreement with that view. Maj. op. at 7 & n.2. Of course there would be no basis whatsoever for this lawsuit if Mr. Panagoulakos shared that view, which cannot be fairly inferred from the one statement from his brief that the majority cites.

show that an officer must be held liable when she extends the detention, or escalates the detention to an arrest, when a reasonable officer would have realized that the basis for the detention has been thoroughly discredited by the newly acquired information.

In this case there is no dispute that Plaintiff's initial detention for investigation of an apparent traffic violation was lawful. As Plaintiff now concedes, his initial arrest was also lawful as the information available to the officers at the scene of the traffic stop supplied the requisite probable cause for arrest. Thus, the first two events in this sequence are quite unremarkable, both legally and factually.

This case took an unusual turn, however. Defendant Yazzie was tasked with taking Plaintiff to the police station and with examining the protective order to see if Plaintiff was in violation of the law for being in possession of a firearm. It is undisputed that the order did not forbid Plaintiff from possessing a firearm. Defendant Yazzie, however, did not know the law and erroneously believed that all persons subject to protective orders are forbidden from possessing firearms. Finding no affirmative statement in the protective order to authorize Plaintiff's firearm possession, Defendant Yazzie did not merely fail to release Plaintiff, she took affirmative steps to insure his continued detention, which led directly to his being held in jail for eleven days on the completely invalid charge of violation of a protective order by possession of a firearm. The majority duly notes this act by

Officer Yazzie, but its analysis completely ignores it.

Officer Yazzie was responsible not just for "sins of omission," but for a "sin of commission." These terms, drawn from religion and steeped in overtones of morality, are useful, I think, even though not precisely applicable. As the majority notes, Officer Yazzie took a very significant, positive step to extend Mr. Panagoulakos's detention: "She then prepared a criminal complaint and had Panagoulakos detained." (Maj. op. at 4.) Yet the majority's analysis is based entirely on the notion that the officer is being called to answer only for failing to release Mr. Panagoulakos. The majority enters the zone of speculation when it posits that Mr. Panagoulakos might have been detained for eleven days even if Officer Yazzie knew the law and realized that there was no probable cause for believing that he had committed the offense of possessing a firearm in violation of a protective order. I am disturbed by the majority's placid acceptance of this speculative proposition which is so squarely at odds with our Constitution.

In any event, our cases do not support this way of defining the issue in cases of wrongful detention. "[I]t of course has long been clearly established that knowingly arresting a defendant without probable cause, leading to the defendant's subsequent confinement and prosecution, violates the Fourth Amendment's proscription against unreasonable searches and seizures." *Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008). In the context of a criminal prosecution, this court has recently noted that an officer's mistake of "substantive

law" is not the kind of mistake "that the Supreme Court has excused," and we reversed a conviction on the ground that evidence had been obtained in violation of the Fourth Amendment. *United States v. Nicholson*, 721 F.3d 1236, 1243 (10th Cir. 2013).

In another recent case, our court addressed this issue in a case with closely analogous facts and held that an officer should have been denied qualified immunity for the continued detention of the plaintiff when facts learned during the initial detention would have made it clear to a reasonable officer in the defendant's position that she "lacked lawful authority to extend the stop." *Courtney v. Oklahoma*, 722 F.3d 1216, 1223 (10th Cir. 2013).

In that case, Mr. Courtney had been stopped for speeding and for not dimming his lights upon the approach of another car. Upon questioning Courtney, Trooper Smith became suspicious that Courtney was involved in some kind of illegal activity. After giving Courtney a warning ticket and indicating to Courtney that he was free to go by wishing him safe travels, Trooper Smith employed the law enforcement technique of quickly asking Courtney if he would be willing to answer some more questions. Courtney declined, whereupon Smith ordered him to return to the patrol car. On further questioning, Courtney told Smith that there was a firearm in the trunk of the car.

During the investigative detention which followed, Trooper Smith ran a routine background check on Courtney. The trooper received a report which

-4-

informed him that Courtney had been adjudicated guilty of felony breaking and entering in another state, twelve years earlier. The report also indicated that the charge was disposed of as a "juv adjudication." Our court noted that a juvenile adjudication over ten years old does not qualify under Oklahoma law as an underlying felony that would have made possession of the gun a crime. Therefore, we held, a reasonable officer would have known that there was no probable cause to believe that Mr. Courtney had committed the crime of felon-in-possession. Consequently, we reversed the district court and held that Trooper Smith was not entitled to qualified immunity.

Similarly, here a reasonable officer would have known that there was no probable cause to believe that Mr. Panagoulakos had committed the offense of possession of a firearm in violation of a protective order.

I have deferred to now discussing the reasons for my statement that there was no probable cause to further detain Mr. Panagoulakos after the protective order had been examined. I believe that the district court's reasoning was absolutely correct. The district court carefully and correctly explained why the protective order did not provide but instead negated probable cause to charge Mr. Panagoulakos with a criminal offense of possession of a firearm in violation of a protective order.

First, the magistrate judge (sitting by consent of the parties) set out the elements of the offense under federal law, 18 U.S.C. § 922(g)(8). The elements

include that the protected person be an "intimate partner" of the restrained person. As the district court noted, "[T]he order made no finding of an 'intimate partner' relationship and a reasonable officer would have understood that by its terms, Plaintiff's right to bear arms was not restricted." Although the analysis here is focused on the reasonable officer and not the subjective thought processes of Officer Yazzie, the district court nevertheless noted that Officer Yazzie had admitted being unaware that federal law requires a finding of "intimate partners" to trigger the firearms prohibition, and so she took no note of the lack of such a finding. Instead, Officer Yazzie believed – incorrectly – that under state law it was always unlawful for a restrained person to possess a firearm (although she apparently believed that an order could expressly provide otherwise), and the officer understood that the arrest was being made under state law.

As the district court noted, however, Officer Yazzie's understanding of state law was mistaken:

> The New Mexico Family Violence Protection Act does not make it a per se violation of an Order of Protection for a restrained party to possess or carry a firearm, however. *See* NMSA 1978, § 40-13-6(D). Likewise, the Order of Protection at issue in this case does not indicate that it constitutes a violation of the Order for Plaintiff to possess or carry a firearm.

Appx. at 189. Consequently, here the district court concluded that

> Defendant Yazzie's erroneous understanding of the law resulted in continued detention without legal authority. Moreover, a reasonable officer would have understood that the probable cause relied upon for the arrest had dissipated based on new absolute information

> dispelling a required element for the arrest and continuing prosecution.

*Id.*

The magistrate judge here went on to consider whether Officer Yazzie might nevertheless be entitled to qualified immunity, focusing on whether the officer's mistake of law was one that could be considered reasonable.[2] Because the requirements of both state and federal law were clear and unambiguous, and both had been established law "for a long time," the court held that the mistake was not reasonable. *Id*. at 190. Further, "[t]he face of the actual Order of Protection vitiated the probable cause that existed at the time of Plaintiff's initial arrest, and Plaintiff was therefore unlawfully detained." *Id*. at 190-91.

For these reasons, I am convinced that the district court was correct not only in denying Officer Yazzie's motion for summary judgment based on qualified immunity, but also in granting partial summary judgment in favor of Mr. Panagoulakos on his claim that his Fourth Amendment rights were violated by Officer Yazzie.

Accordingly, I must respectfully dissent.

---

[2]Here the judge cited *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1300 (10th Cir. 2004).

-7-