**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**May 31, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

CLARENCE MOSES-EL,

    Plaintiff - Appellant,

v.

CITY AND COUNTY OF DENVER;
MITCHELL R. MORRISSEY; BONNIE
BENEDETTI; LYNN KIMBROUGH;
ROBIN WHITLEY; JEFF CARROLL;
DR. KATHRYN BROWN-DRESSEL;
ESTATE OF JAMES HUFF,

    Defendants - Appellees.

------------------------------

PUBLIC JUSTICE; THE CIVIL RIGHTS
EDUCATION AND ENFORCEMENT
CENTER; THE COLORADO CROSS-
DISABILITY COALITION; COLORADO
PLAINTIFFS EMPLOYMENT
LAWYERS ASSOCIATION;
DISABILITY RIGHTS ADVOCATES;
NATIONAL EMPLOYMENT LAWYERS
ASSOCIATION; THE EMPLOYEE
RIGHTS ADVOCACY INSTITUTE FOR
LAW & POLICY,

    Amici Curiae.

No. 20-1102
(D.C. No. 1:17-CV-03018-MSK-NRN)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

_____

Before **TYMKOVICH**, Chief Judge, **KELLY**, and **PHILLIPS**, Circuit Judges.

_____

Clarence Moses-EL served 28-plus years in Colorado state prison after a jury convicted him of first-degree sexual assault, second-degree burglary, and second-degree assault. After a Colorado state court vacated his convictions, the State of Colorado retried him on the same charges. This time, a jury acquitted him.

In this suit, Moses-EL seeks damages under 42 U.S.C. § 1983 for constitutional violations based on his claims of malicious prosecution, destruction of DNA evidence, manufacturing witness testimony, substantive-due-process violations, civil conspiracy, supervisory liability, and municipal liability.

All defendants moved to dismiss, and the district court granted their motions. Afterward, Moses-EL moved to amend the judgment and sought leave to file a second amended complaint. The district court denied these motions. Moses-EL appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.    Factual Background[1]

### A.    The Initial Crime, Investigation, and Trial

During the evening of August 15, 1987, T.S. attended a party at a friend's

_____

[1] The contents of this section are taken from the Amended Complaint. We disregard all legal conclusions and irrelevant allegations. *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1287 (10th Cir. 2018). But we accept as true all relevant, well-pleaded facts and view them in the light most favorable to the plaintiff. *Id.*

house, which was two doors from her own home in a Denver low-income housing project. At about 2:15 a.m., T.S. left the party and returned home. Soon after that, she fell asleep on her living-room couch with her infant child and toddler in arm's reach.

Minutes later, an assailant entered her home (apparently through a kitchen window) and repeatedly raped and severely beat her. The beating fractured T.S.'s facial bones and swelled her eyes shut. During the attack, T.S. temporarily lost consciousness.

After the assailant left, T.S. went to her sister's home, arriving at about 3:30 a.m. Her physical condition was such that her sister didn't immediately recognize her. At that time, T.S. described the physical attack, and her sister's boyfriend, Floyd Wesley Howard, called the police.

At about 3:50 a.m., the police arrived. T.S. told an officer "that she did not get a good look at [her attacker] because it had been dark and the lights were out." Joint App. Vol. 2 at 230. But she mentioned that two men at the party—"L.C. and Earl"— had slick-back, wavy hair, like the rapist. Joint App. Vol. 2 at 230. An ambulance then took T.S. to the hospital.

A few hours later, when T.S.'s sister asked who had attacked her, T.S. replied, "Darnell, Earl, L.C."—listing three men who had been at the party. Joint App. Vol. 2 at 228, 231. T.S. gave the police the same names.

More than a day later, while still in the hospital and medicated, T.S. had a dream in which she "re-lived" the attack. Joint App. Vol. 2 at 231. Based on that

3

dream, she then identified Moses-EL—a neighbor who hadn't attended the party—as her attacker.

James Huff, a detective in the Denver Police Department, was assigned to investigate T.S.'s physical assault and rape. During his investigation, he learned of a feud between T.S. and Stephanie Burke, Moses-EL's then-wife.[2] The feud stemmed from a dispute between their two- and three-year-old boys. The hostility between T.S. and Burke led Detective Huff to question T.S.'s identification of Moses-EL. He conveyed these concerns to the Denver District Attorney's Office ("DA's Office") and memorialized them in a sworn statement. Even so, the Denver Police Department and DA's Office remained focused on Moses-EL.

Three days after the attack, the authorities arrested and charged Moses-EL with first-degree sexual assault, second-degree burglary, and second-degree assault. The Denver Police Department had earlier collected vaginal swabs from T.S., prepared a rape kit, and obtained some of T.S.'s clothing. Moses-EL alleges that he repeatedly asked his defense counsel to obtain DNA testing of this evidence, but his counsel refused.[3]

---

[2] The Amended Complaint sometimes refers to Burke as Moses-EL's girlfriend and sometimes as his then-wife. As best we can tell, the two were married but divorced sometime along the way.

[3] According to Moses-EL, in 1987, the prevailing view among public defenders was that "DNA testing generally benefitted prosecutors" and the admission of DNA evidence "should be opposed in every case." Joint App. Vol. 2 at 240.

In the ensuing investigation, Dr. Kathren Brown (currently known as Dr. Brown-Dressel), a forensic serologist employed by the Denver Police Department, conducted blood-type testing from vaginal swabs collected from T.S. The swabs contained concentrations of semen and sperm. From her testing, Dr. Brown-Dressel reported to Detective Huff that no male, including Moses-EL, could be excluded as a suspect. Her laboratory notes preceding Moses-EL's first criminal trial summarized this conclusion: "Results—can't exclude anybody." Joint App. Vol. 2 at 241.

In April 1988, Moses-EL's case was tried to a jury. Dr. Brown-Dressel testified that T.S. was an O secretor and that Moses-EL was a B secretor. This meant that they would both have secreted antigens into their bodily fluids, such as vaginal fluid or semen. And these antigens would have revealed their blood types. Dr. Brown-Dressel testified that although the evidence showed the presence of an O secretor (which matched T.S.'s blood type), it contained no evidence of B antigens. Despite no B antigens in T.S.'s samples, Dr. Brown-Dressel concluded that these results just meant that she couldn't "exclude any males from depositing that seminal fluid." Joint App. Vol. 2 at 244. Moses-EL's counsel didn't offer competing expert testimony.

Moses-EL did not testify at his trial. The jury ultimately convicted him on all three charges. The court sentenced him to 48 years on the sexual-assault conviction and 16 years each for the other two convictions, all to be served concurrently.

B.      **Moses-EL's DNA Exoneration Efforts**

In August 1992, four years after his conviction, Moses-EL filed a pro se Rule 35(c) motion in Colorado state court, arguing that his trial counsel had provided ineffective assistance by choosing not to obtain DNA testing. The trial court denied the motion without a hearing. But in September 1993, the Colorado Court of Appeals reversed the trial court's decision and remanded the case for a hearing on the ineffective-assistance-of-counsel claim, as well as to determine whether the samples were still available for DNA testing.

On November 11, 1993, the Denver Police Department asked about the availability of the rape kit and clothing from T.S.'s 1987 assault and learned that the trial court still had them.[4] On November 20, 1993, the evidence was reentered into the Denver Police Department's Property Bureau to evaluate whether DNA remained available to analyze. That same day, Detective Huff received a memorandum updating him on this development.

At some point between 1993 and 1995, Moses-EL's counsel requested that the Denver Police Department and DA's Office preserve the evidence until Moses-EL could hire a laboratory to conduct DNA testing. Moses-EL then began raising funds from his fellow inmates. By 1995, he had raised the needed $1,000 for DNA testing.

---

[4] Moses-EL also alleges that in 1987, Detective Huff had placed "two tubes of blood and three tubes of saliva" for his case at a laboratory. Joint App. Vol. 2 at 261. In 1988, Detective Huff had marked this evidence for destruction. Despite this designation, the blood and saliva evidence was not destroyed. Yet no one could locate this evidence.

In May 1995, Robin Whitley, the Deputy DA assigned to Moses-EL's case, contacted Ann Perry, a serologist in the Denver Police Department. Deputy DA Whitley asked Perry to determine whether the crime-scene samples were still available and, if so, to preserve them.[5]

In July 1995, Perry determined that the samples were still available. Perry packaged the samples and prepared them for shipping to the DNA laboratory by putting them in a sealed box marked "DO NOT DESTROY." Joint App. Vol. 2 at 253. On July 19, 1995, Perry notated in a computer entry, "HOLD FOR DA ROBIN WHITLEY." Joint App. Vol. 2 at 253. Perry left the samples with the Denver Police Department Property Management Bureau. That ended Perry's involvement with the samples. Perry never advised Detective Huff of the need to preserve the evidence.

On October 5, 1995, R. Cubbage, a Denver Police Department Property Management Bureau Technician, sent Detective Huff a printout of the invoices of case evidence in the Department's possession and asked whether he should hold, destroy, or sell the evidence. Included within the listings in that printout was the evidence from T.S.'s attack.

---

[5] The Amended Complaint does not explain the time jump between November 1993 and May 1995. Presumably, during that time, Moses-EL was raising the money needed to conduct the DNA testing. But we are uncertain why, in 1995, Deputy DA Whitley needed to determine "whether the crime-scene samples were still available" if Moses-EL's counsel, the Denver Police Department, and the DA's Office had already agreed to preserve the samples in 1993. Joint App. Vol. 2 at 253.

7

On October 11, 1995, Detective Huff looked at the invoice and saw that it included evidence from an August 1987 case. He didn't read the "comments" section of the invoice, which stated: "HOLD FOR DA ROBIN WHITLEY."  Joint App. Vol. 2 at 255. He assumed that the evidence would no longer be needed and marked it for disposal. The Amended Complaint includes this highlighted copy of the invoice:

```
                      ( )                      (                    H194
5625-PR2    :D E N V E R   P O L I C E   D E P A R T M E N T
                        *** 10/05/95 10:03:40 ***
PROPERTY SECTION INVENTORY SYSTEM - INVOICE DETAIL FOR INVOICE 358430

   TS PROPERTY HAS BEEN HELD FOR 1 YEAR OR MORE, OR HAS BEEN SCHEDULED
   ₹ RELEASE.   MARK THE APPROPRIATE DISPOSITION, SIGN AND RETURN TO THE
PROPERTY SECTION WITHIN 10 DAYS. (SEE OPS. MANUAL SEC. 106.00)
OFFICER NOTIFICATION DATES: 10/05/95
DISPOSE OF     X            HOLD     CASE #        REQ'D
RELEASE     TOTAL  X   CIRCLED ITEMS ONLY    TAKE PHOTO    OWN PROOF
TO:                        ADDRESS                     ZIP
OWNER NOTIFIED    (Y/N) NOTIFIED DATE      CARD SENT?   (Y/N) BY/SER. NO.
SIGNED/OFF.NAME    DET.  Huff              SER.NO. 70-37    DATE  10-11-95
**********************************************************************
   DISPO INFO CALL: - FELONIES/X2876 - STATE MISD./X1049 - GSS&C/X3885
**********************************************************************

==================================================================

INVOICE NMBR: 358430 INVOICE DATE: 81687
RECEIVED BY: 73026 OFFICER(S) RECOVERING: 86029
CASE NMBR: 239223 DETECTIVE(S) ASSIGNED: 70037
WHERE RECOVERED: ████████████
COMMENTS: HUFF-CHECKS
        : HOLD FOR DA ROBIN WHITLEY
        :
PRISONER: MOSES, CLARENCE
AGE: 0 DOB: 0 ARREST DATE: 0 CHARGE: SEX ASSAULT
'C/O/F/VICTIM': ████
ADDRESS: ████████  DENVER CO (V)(O) PHONE: 0
.... ITEM NMBR 1 - DISPOSITION
ARTICLE NAME: CLOTHI
  ~DENCE: X
  I NMBR: H194
COMMENTS: 1 UNDERWEAR,2 BEDSHEETS,1 SHIRT,1 JEANS
```

Joint App. Vol. 2 at 255.

Detective Huff later testified that the DA's Office usually advised him directly when evidence needed to be saved. But neither Perry nor Deputy DA Whitley told him of the need to "hold" this evidence. Detective Huff also testified that he didn't know that Moses-EL's case was still active. Notably, two years had passed since

November 1993, when he had been notified that case evidence was being reentered into the Denver Police Department's Property Bureau.

On October 26, 1995, Deputy DA Whitley wrote a letter to Moses-EL's defense counsel advising him that the evidence was available to be picked up from the police department after the court signed an authorizing order. Deputy DA Whitley had apparently not checked to see that the evidence had been marked for disposal before notifying Moses-EL's attorney.

On November 2, 1995, the prosecution and defense jointly stipulated to the release and shipping of the rape kit and clothing to a lab in California for DNA testing. That same day, the court ordered the release of the evidence for testing which, Moses-EL asserts, required the defense to promptly ship it by Federal Express.

But Moses-EL's counsel didn't pick up the package for shipping that day. Instead, his attorneys deferred retrieving the evidence until they could obtain and include a saliva sample from Moses-EL.[6] Moses-EL's attorneys had to await his transfer "to a Denver facility" before they could get his saliva sample. Joint App. Vol. 2 at 258.

---

[6] Moses-EL alleges that the purpose of including the saliva sample with the rape-kit evidence was to "maintain a secure chain of custody." Joint App. Vol. 2 at 258. But he doesn't elaborate how including the saliva sample would accomplish this task.

On December 3, 1995—after another month passed with Moses-EL's attorneys still failing to collect the package and send it to the laboratory for DNA testing—Cubbage, acting under standard procedure, retrieved the invoices marked for property destruction and had them destroyed. This included the evidence from T.S.'s attack.

In January 1996, Deputy DA Whitley learned that the evidence in Moses-EL's case had been destroyed. Soon after, someone from the government sent Moses-EL's attorneys a letter informing them of this development.

In April 1997, before the Rule 35(c) hearing, Dr. Brown-Dressel completed another report analyzing the serological evidence in Moses-EL's criminal case. In this report, she detailed her expected testimony and reiterated that she couldn't exclude any sperm-producing male as a suspect.

In May 1997, the district court again denied Moses-EL's Rule 35(c) motion.

## C.    Publicity on Moses-EL's Case in the Ensuing Years

In July 2007, *The Denver Post* profiled the evidence destruction in Moses-EL's case as part of an investigative series. In response, the DA's Office issued a press release in which the current District Attorney, Mitchell Morrissey, asserted that he had reopened Moses-EL's case, had personally reviewed it, and had spoken with the original prosecutors and defense counsel. Based on his review, DA Morrissey concluded "that everything that could be presented to a jury, or could be presented to a jury now, was presented at trial and considered by a jury." Joint App. Vol. 2 at 268 (brackets omitted).

In March 2008, a Colorado State senator sponsored and introduced Senate Bill 08-205, which Moses-EL alleges was inspired by his case. According to Moses-EL, as originally proposed, the bill would have entitled him to a new trial.

Moses-EL alleges that DA Morrissey improperly opposed the bill by misrepresenting important facts about his case in testimony to the legislative committee and in statements to the media.

In the end, the state legislature passed a "watered-down version" of the bill that did not apply to Moses-EL's case.

## D.    L.C. Jackson

In April 2012, more than twenty years after T.S.'s assault, L.C. Jackson—one of the three men whom T.S. had originally identified as having been at the party—sent a letter to Moses-EL. The letter stated that Jackson had "a lot on [his] heart" and wanted to bring "what was done in the dark into the light." Joint App. Vol. 2 at 273. The Amended Complaint contains a reproduction of the letter:

Joint App. Vol. 2 at 273.

11

Jackson began making admissions of partial culpability to Moses-EL's attorneys and investigators.[7] Jackson asserted that on the night of T.S.'s attack, he left his girlfriend's party at which he and T.S. had been drinking, entered T.S.'s home, engaged in *consensual* sexual intercourse with T.S., and then beat T.S. repeatedly after becoming upset with her. Based on this information, in December 2013, Moses-EL filed a second Rule 35(c) motion asking for a new trial.

In September 2014, the district court granted Moses-EL a preliminary evidentiary hearing based on his Rule 35(c) motion. At this hearing, Bonnie Benedetti, then the Chief Deputy DA, questioned the credibility of Jackson's admissions, noting that the statutes of limitations had run for the charged crimes. At Moses-EL's request, the district court issued a writ to bring Jackson from prison to court to testify in the upcoming Rule 35(c) hearing.[8]

---

[7] The Amended Complaint is vague on the sequence of events. It's unclear whether Jackson sent the letter to Moses-EL first, or whether investigators spoke with Jackson before he sent the letter. According to the Amended Complaint, DA Morrissey later advised the media that Jackson's admissions were not credible because, at some point, Jackson had apparently told investigators that "he had lied and had made the confession up." Joint App. Vol. 2 at 283. Jackson explained that the Innocence Project had told him "that he couldn't be charged in the matter because of the statute of limitations." Joint App Vol. 2 at 283. From this, Jackson "felt he could tell a few lies to help out Moses-EL." Joint App Vol. 2 at 283 (brackets omitted).

[8] At the time, Jackson was serving a prison sentence for the 1992 rape and sexual assault of a mother and daughter. The prosecution arose after a 2006 DNA match to the 1992 crimes.

In May 2015—before the scheduled Rule 35(c) hearing—Chief Deputy DA Benedetti and Jeffrey Carroll, an investigator with the DA's Office, visited Jackson in prison. There, Investigator Carroll issued Jackson a *Miranda* warning. After Jackson asked if he was under arrest, Investigator Carroll told him that he could face charges based on the admissions that he made. Along this line, Chief Deputy DA Benedetti told Jackson he could be charged with perjury. Jackson later claimed that their statements during the visit "[c]onfused" and "spooked" him. Joint App. Vol. 2 at 276. So that night, Jackson wrote a note recanting his earlier statements.

Three days after visiting Jackson, Chief Deputy DA Benedetti requested that the district court appoint Jackson his own counsel to protect his right against self-incrimination. She asserted that the DA's Office could still prosecute Jackson for kidnapping T.S., because, in Colorado, kidnapping has no statute of limitations.

In late July and early August 2015, the court held Moses-EL's evidentiary hearing. Jackson, now represented by counsel, returned to his earlier position: that he had consensual sex with T.S. and beat her after getting upset with her. Jackson also testified that he regretted writing the recantation note for Chief Deputy DA Benedetti and Investigator Carroll and had done so because they had intimidated him.

### E.    Granting Moses-EL's Rule 35(c) Motion

In December 2015, based on Jackson's testimony, the district court issued a written order vacating Moses-EL's convictions and granting him a new trial. The court then released Moses-EL on bond. While out on bond, Moses-EL claims that Lynn Kimbrough, the Communications Director for the DA's Office, misrepresented

facts about Moses-EL's case to the media.[9]

### F.    A Second Investigation

Moses-EL alleges that before his second prosecution, Chief Deputy DA Benedetti and Investigator Carroll fabricated witness evidence to generate probable cause to charge Moses-EL again. More specifically, Moses-EL alleges that Chief Deputy DA Benedetti and Investigator Carroll encouraged Floyd Wesley Howard, the boyfriend of T.S.'s sister at the time of T.S.'s assault, to testify that T.S. had identified Moses-EL as her assailant on the night of the attack. According to Moses-EL, Howard had never previously recounted this fact to investigators.[10] Yet after 28 years, he managed to remember this important detail for the prosecution. Moses-EL insinuates that Chief Deputy DA Benedetti and Investigator Carroll urged Howard to testify for them in exchange for a "government-funded trip back to Colorado." Joint App. Vol. 2 at 294.

Investigator Carroll first called Howard in May 2015.[11] During that call, Howard told Carroll that he "did not recall a lot about the incident" but "believed that

---

[9] On appeal, Moses-EL doesn't challenge the district court's dismissal of Communications Director Kimbrough from this action. So we see no need to recount the allegations or claims against her.

[10] The Amended Complaint alleges that after Howard called the police on the night of T.S.'s attack, "he went to Mr. Moses-EL's house and 'asked him did he know what happened to T.S.'" Joint App. Vol. 2 at 271 (brackets omitted).

[11] The Amended Complaint states that on "May 20, 2015, more than 28 years after the attack on T.S., Defendant Carroll called Mr. Howard." Joint App. Vol. 2 at 291. We're unsure if "May 20, 2015" was intentional, or if there was a typo and Moses-EL meant to allege "May 20, 2016." We note this fact because May 2015

T.S. had said she was assaulted by 'Bubba,' who he knew to be the same person who was sent to prison for the assault." Joint App. Vol. 2 at 291. Moses-EL's nickname at the time was "Bubbles." But Howard said that his confidence in this memory was a "1 out of 10, with 1 being the least sure." Joint App. Vol. 2 at 292.

Then in August 2016, Chief Deputy DA Benedetti and Investigator Carroll again spoke with Howard, who said he had been "racking his brain" since the previous call. Joint App. Vol. 2 at 292. And in that conversation, Howard again reported that on the night of T.S.'s assault, T.S. had identified "Bubba"— Moses-EL—as the one who had assaulted her. Joint App. Vol. 2 at 291–92.

Moses-EL also alleges improper conduct by Chief Deputy DA Benedetti and Investigator Carroll in recruiting Burke to testify at Moses-EL's retrial about an argument that she had with Moses-EL on the night of T.S.'s attack. Chief Deputy DA Benedetti allegedly used Burke's testimony to support the government's theory that Burke had "directed" Moses-EL to commit the crimes against T.S. Joint App. Vol. 2 at 295. Though Burke's lawyers asserted a testimonial privilege on Burke's behalf, Moses-EL alleges that Chief Deputy DA Benedetti provided Burke with an unspecified immunity to force her to testify for the prosecution.[12]

### G.   Moses-EL's Second Trial

---

would only be 27 years after the attack on T.S. (which occurred in August 1987). But we'll assume that Moses-EL meant what he said—May 20, 2015.

[12] Moses-EL also alleges that Chief Deputy DA Benedetti acted improperly by offering him an *Alford* plea with a recommended sentence of time served.

In November 2016, after Moses-EL had been out on bond for nearly a year, the government retried him for T.S.'s assault and rape. At the trial, the government called Howard, Burke, and Dr. Brown-Dressel as witnesses. And though Jackson didn't testify at this trial, defense counsel read the substance of his testimony from the Rule 35(c) hearing to the jury. The jury ultimately found Moses-EL not guilty on all charges.

## II.    Procedural Background

In December 2017, Moses-EL filed this federal suit. Four months later, he amended his complaint. Separate groups of defendants moved to dismiss, starting with a motion from DA Morrissey, Chief Deputy DA Benedetti, Deputy DA Whitley, Communications Director Kimbrough, and Investigator Carroll. Next, came the City and County of Denver (collectively, "Denver") and Dr. Brown-Dressel's. And after that, the Estate of James Huff ("Estate") filed its motion on behalf of Detective Huff, who had died.[13]

The district court granted all three motions in one consolidated order, concluding that Moses-EL had failed to state a plausible claim for relief. It then entered a final judgment and closed the case.

About a month later, Moses-EL moved to alter or amend the judgment under Fed. R. Civ. P. 59(e). That same day, Moses-EL also requested leave to file a second

---

[13] The parties disagree whether Colorado law even permits the Estate to be sued. *See* Colo. Rev. Stat. § 15-12-803(2)(b). We need not resolve this dispute because, as we will explain below, Moses-EL's claim fails on the merits.

16

amended complaint and attached a proposed second amended complaint. The district court denied both motions. This appeal followed.[14]

## DISCUSSION

### I.    Standard of Review

Our review of a Rule 12(b)(6) motion is de novo, and we apply the same standard as the district court. *See Fourth Corner Credit Union v. Fed. Resrv. Bank of Kan. City*, 861 F.3d 1052, 1054 (10th Cir. 2017). To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

Under the 12(b)(6) analysis, we start by discounting all allegations that are no more than legal conclusions. *See id.* at 679. With the remaining nonconclusory factual allegations, we "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

This "plausibility standard" "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). But "it asks for more than a sheer possibility

---

[14] Moses-EL has not appealed the dismissals of Deputy DA Whitley and Communications Director Kimbrough.

that a defendant has acted unlawfully." *Id.* When a complaint pleads facts that are

"'merely consistent with' a defendant's liability," it "'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S.

at 557). "The nature and specificity of the allegations required to state a plausible

claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d

1210, 1215 (10th Cir. 2011).

## II.    The District Court's 12(b)(6) Analysis

Before reaching each of Moses-EL's claims, we address Moses-EL's repeated

argument that the district court misapplied the plausibility standard that governs

Rule 12(b)(6) motions under *Iqbal* and *Twombly*. Moses-EL points to two instances

in the district court's order which, he argues, show an improper application of a

heightened pleading standard. First, the district court wrote that "Mr. Moses-El must

plead facts that, taken in the light most favorable to him, dispel the possibility that

the defendant acted with mere negligence." Joint App. Vol. 4 at 855. Second, it

reasoned that "*Iqbal* requires Mr. Moses-El to plead facts that establish a <u>probability</u>,

not a <u>possibility</u>, that Dr. Brown acted with malice against him." Joint App. Vol. 4

at 857 (emphasis in original).

We acknowledge that in these instances the district court misstated the

governing standard. We also agree with Moses-EL that he need not (1) "dispel the

possibility" that he acted with negligence to survive a motion to dismiss, nor

(2) plead facts that a establish a "<u>probability</u>, not a <u>possibility</u>" of malice to make it

past the pleading stage. Joint App. Vol. 4 at 855, 857. But despite those stumbles, we

are confident that, when read in context, the district court's order correctly applied *Iqbal* and *Twombly*'s pleading requirement. For example, the district court correctly noted that to state a plausible claim for relief, "a plaintiff must plead facts that show 'more than the mere possibility of misconduct.'" Joint App. Vol. 4 at 854 (quoting *Iqbal*, 556 U.S. at 679).

But even if the district court improperly applied a heighted pleading requirement, as explained above, our review of the district court's decision is de novo. So we need not defer to the district court's conclusions.

### III.    Claims on Appeal

On appeal, Moses-EL challenges the district court's dismissal of seven claims, all brought under 42 U.S.C. § 1983: (1) a claim for malicious prosecution under the Fourth and Fourteenth Amendments against DA Morrissey, Chief Deputy DA Benedetti, Investigator Carroll, Dr. Brown-Dressel, and the Estate; (2) a claim for destruction of evidence under the Fourteenth Amendment against the Estate; (3) a claim for "manufactured false inculpatory evidence" under the Fourteenth Amendment's substantive-due-process component against Chief Deputy DA Benedetti and Investigator Carroll; (4) a claim against Denver for maintaining unconstitutional customs and policies that violate the Fourteenth Amendment; (5) a claim for civil conspiracy against DA Morrissey, Chief Deputy DA Benedetti, and Investigator Carroll; (6) a claim that Moses-EL's substantive- and procedural-due-process rights under the Fourteenth Amendment were violated against all defendants; and (7) a claim against DA Morrissey for failure to adequately supervise his

19

subordinates, which resulted in violations of Moses-EL's substantive- and

procedural-due-process rights under the Fourteenth Amendment.

In opposing these claims, each defendant has invoked the defense of qualified

immunity. To resolve qualified immunity on a motion to dismiss, a court must consider

(1) whether the plaintiff has sufficiently alleged the violation of a constitutional right, and

(2) whether the right was clearly established at the time. *See Keith v. Koerner*, 707 F.3d

1185, 1188 (10th Cir. 2013). Because it's the plaintiff's burden to satisfy this "strict

two-part test," we may grant qualified immunity if a plaintiff fails either prong. *Dodds v.*

*Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010) (citation and internal quotation

marks omitted).

As we will explain below, we conclude that Moses-EL has not plausibly pleaded

any constitutional claims. Thus, he can't meet his burden on the first prong. As a result,

all individual defendants are entitled to qualified immunity. *See Reeves v. Churchich*, 484

F.3d 1244, 1250 (10th Cir. 2007) ("If the court concludes no constitutional right has been

violated, no further inquiry is necessary and the defendant is entitled to qualified

immunity.").

### A.    Malicious Prosecution

#### 1.    Elements of Malicious-Prosecution Claim

In evaluating a § 1983 malicious-prosecution claim, we start with the

common-law elements for malicious prosecution. *Wilkins v. DeReyes*, 528 F.3d 790,

797 (10th Cir. 2008) (citation omitted). A plaintiff must show that "(1) the defendant

caused the plaintiff's continued confinement or prosecution; (2) the original action

terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."[15] *Id.* at 799 (citations omitted). The key inquiry "is whether plaintiff has proven the deprivation of a constitutional right." *Id.* at 797.

Moses-EL's malicious-prosecution claims must fail because he has not plausibly alleged the third or fourth elements—lack of probable cause and presence of malice—for his 1988 or 2016 prosecutions.

### 2.    Malice

For a plaintiff to plausibly plead malice as required for a malicious-prosecution claim, the plaintiff must allege that a defendant acted either "knowingly" or with "reckless disregard for the truth." *See Sanchez v. Hartley*, 810 F.3d 750, 755–56 (10th Cir. 2016) (citation omitted); *see also Young v. City of Idabel*, 721 F. App'x 789, 804 (10th Cir. 2018).

---

[15] Moses-EL argues that the Supreme Court's recent decision in *Thompson v. Clark*, 142 S. Ct. 1332 (2022) suggests that malice is not an additional element of a malicious-prosecution claim. But *Thompson* specifically declined to resolve that question. *Id.* at 1338 n.3 ("We need not decide whether a plaintiff bringing a Fourth Amendment claim under § 1983 for malicious prosecution must establish malice (or some other mens rea) in addition to the absence of probable cause."). In our circuit, malice is a distinct element. *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1258–59 (10th Cir. 2007) (holding that the plaintiff had failed to establish a lack of probable cause *and* "the fourth (malice) element of a malicious prosecution claim"); *Wilkins*, 528 F.3d at 799–800 (denying summary judgment for malicious-prosecution claim because questions of fact existed as to malice); *see also Mglej v. Gardner*, 974 1151, 1171 n.14 (10th Cir. 2020) ("[T]he malice element of a Fourth Amendment malicious prosecution claim focuses on the defendant officer's knowledge or state of mind.").

### a.    Detective Huff

In most malicious-prosecution claims, a plaintiff seeks to hold a defendant liable for arresting him or her without probable cause or for omitting exculpatory information from an affidavit to obtain a warrant. *See, e.g.*, *Cortez v. McCauley*, 478 F.3d 1108, 1115–16 (10th Cir. 2007) (en banc) (malicious-prosecution claim based on lack of probable cause for warrantless arrest); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (malicious-prosecution claim based on information excluded from warrant affidavit). But not here. Instead, Moses-EL's claim against Detective Huff "centers around" Detective Huff's "failure in 1987–88 to investigate" Jackson. Opening Br. at 30–31.

Moses-EL faces an uphill battle in plausibly alleging malice. This is so because "[t]he failure to investigate a matter fully, to 'exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence' rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be token negligence 'at most.'" *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 116 (10th Cir. 1994) (internal citations and emphasis omitted) (quoting *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993)).

Our circuit has not decided a case involving a malicious-prosecution claim based on a failure to investigate alternative suspects. But in *Romero v. Fay*, 45 F.3d 1472, 1475–76 (10th Cir. 1995), we considered whether an officer's failure to thoroughly investigate a murder might violate a plaintiff's constitutional rights under a wrongful-arrest and an unreasonable-post-arrest-investigation theory. There, the

22

officer arrested the plaintiff after interviewing two witnesses who accused the plaintiff of shooting the victim. *Id.* at 1474. The plaintiff maintained his innocence and insisted that he had an alibi. *Id.* The plaintiff also told the officer that another individual had tried to fight the victim about two hours before he was killed. *Id.* The officer didn't speak with the plaintiff's alibi witnesses and refused to interview the witnesses to the fight. *Id.* After the plaintiff was imprisoned for three months, the prosecutors declined to pursue the case. *Id.*

The plaintiff then brought a § 1983 action against the officer, among others, for violating his Fourth and Fourteenth Amendment rights. *Id.* As is pertinent to our case, the plaintiff accused the officer of violating his constitutional rights by not contacting his alibi witnesses and by failing to interview those who saw another suspect threaten and try to fight the victim the night he was murdered. *Id.* at 1477–79.

On appeal, we noted that "[w]ith the benefit of hindsight, it may have been fruitful" for the officer to speak with the plaintiff's alibi witnesses and to contact those who saw the other suspect threaten the victim. *Id.* at 1479. Still, we held that the officer's failure to investigate "as efficiently as possible," as alleged by the plaintiff, did not exceed negligence, which defeated the claim of a constitutional violation. *Id.*

Other circuits have also analyzed whether an allegedly deficient investigation might rise to the level of a constitutional tort. For example, in *Clemmons v. Armontrout*, 477 F.3d 962, 963 (8th Cir. 2007), a plaintiff alleged that an investigator's decision not to "investigate exculpatory leads or exonerating

23

information" led to his wrongful conviction and 14 years on death row. The Eighth Circuit held that the investigator's failure to consider another possible suspect did not violate the plaintiff's constitutional rights—despite three other witnesses having accused the other suspect of committing the crime. *Id.* This is because another witness had still identified the plaintiff as the murderer, and the investigator had not coerced others to stop investigating other leads. *Id.* at 966.

The Fifth Circuit's decision in *Sanders v. English*, 950 F.2d 1152 (5th Cir. 1992), *abrogated on other grounds by Albright v. Oliver*, 510 U.S. 266 (1994) is also instructive. There, the Fifth Circuit held that a detective could be liable under § 1983 because he "deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man[.]" *Id.* at 1162. This evidence included: three credible alibi witnesses, a negative identification by a witness, and a "belated identification by the victim under peculiar circumstances." *Id.* The detective's "deliberate failure to disclose this undeniably credible and patently exculpatory evidence to the prosecutor attorney's office," the Fifth Circuit explained, "plainly expose[d] him to liability under § 1983." *Id.*

With the aid of these cases, we conclude that Moses-EL has not plausibly alleged that Detective Huff's failure to investigate Jackson "suggests a knowing or reckless disregard for the truth." *Beard*, 24 F.3d at 116 (quoting *Dale*, 991 F.2d at 844). Though investigating Jackson may have proven "fruitful" with the "benefit of hindsight," Detective Huff did not ignore a potential alibi or other witnesses, such as the officer in *Romero*. 45 F.3d at 1479. Nor did he fail to report substantial

24

exculpatory information to prosecutors, like the detective in *Sanders*. In fact, Detective Huff informed his superiors about potentially exculpatory evidence—the feud between Moses-EL's then-wife and T.S. Additionally, Moses-EL does not allege that Detective Huff coerced others to stop investigating other possible leads, and Moses-EL must acknowledge that T.S. has steadfastly identified him as the rapist—both of which were relevant facts to determining whether there was a constitutional violation in *Clemmons*. Finally, to the extent that Detective Huff somehow could be said to have not credited potentially exculpatory evidence (such as T.S.'s dream-state identification or the lack of physical evidence), that failure does not come close to the amount of disregarded evidence as in *Clemmons*, where the Eighth Circuit still found no constitutional violation.

In short, accepting Moses-EL's well-pleaded allegations as true and drawing all reasonable inferences in his favor, Detective's Huff's failure to investigate Jackson amounts "at most" to negligence—and that is not enough to have violated Moses-EL's constitutional rights.[16]

---

[16] Even if we assumed that Moses-EL had sufficiently alleged that Detective Huff had violated his constitutional rights, the Estate would still be entitled to qualified immunity because Moses-EL has not met his burden to show that the law was clearly established. Though Moses-EL cites *Garcia v. Johnson*, 64 F.3d 669 (10th Cir. 1995) (unpublished table decision) and *Taylor v. Meacham*, 82 F.3d 1556 (10th Cir. 1996) as clearly establishing that an individual has the "right to be free from malicious prosecution," neither case supports him. Reply Br. at 36. First, *Garcia* is unpublished, so Moses-EL may not rely on it to show clearly established law. *See Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) (explaining that an unpublished opinion "provides little support for the notion that the law is clearly established on a point" (brackets and citation omitted)). Second, *Taylor* did not even address the clearly established prong of qualified immunity. 82 F.3d at 1564

Thus, the district court properly dismissed the malicious-prosecution claim against the Estate.

### b.    Dr. Brown-Dressel

Next, Moses-EL argues that he has stated a claim for malicious prosecution against Dr. Brown-Dressel because she falsified evidence, or at the very least recklessly disregarded the truth. We disagree. Instead, the Amended Complaint alleges—at most—that Dr. Brown-Dressel acted negligently. Thus, we again conclude that Moses-EL has failed to adequately plead malice.

In *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), we examined whether a plaintiff had plausibly alleged a malicious-prosecution claim against a forensic analyst. There, the forensic analyst had fabricated inculpatory evidence and disregarded exculpatory evidence to support the plaintiff's prosecution, even though the evidence tended to exonerate him. *Id.* at 1294.

This circumstance in *Pierce* differs markedly from Moses-EL's case. He has not alleged that Dr. Brown-Dressel fabricated evidence to implicate him in T.S.'s rape. And while Moses-EL does allege that Dr. Brown-Dressel's testing might have

---

("Having concluded that no constitutional right was violated . . . we proceed no further on the qualified immunity issue."). Finally, and most importantly, courts are "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, we must look to the specific context of each case. *Id.* And the Supreme Court has stated that such "specificity is especially important in the Fourth Amendment context." *Id.* Neither *Garcia* nor *Taylor* are sufficiently analogous to our case to show that the law was clearly established.

led to an acquittal if she agreed with his present experts about what the undisputed test results meant, we cannot reasonably infer that Dr. Brown-Dressel acted maliciously by reaching her own, different conclusion. Even treating Moses-EL's present experts' conclusions as true, they support Dr. Brown-Dressel's negligence, not malice.[17] Moses-EL's repeated legal conclusions that Dr. Brown-Dressel's actions were "malicious" and done with "knowing[] and with reckless disregard for the truth" cannot save his claim.[18] Joint App. Vol. 2 at 243, 246.

     *c.*   *Chief Deputy DA Benedetti and Investigator Carroll*

We turn now to the allegations against Chief Deputy DA Benedetti and Investigator Carroll. Moses-EL alleges that they intimidated Jackson into issuing a "flimsy recantation" and manufactured false inculpatory witness testimony to

---

[17] Like the Estate, Dr. Brown-Dressel would be entitled to qualified immunity because the law at the time had not clearly established that Dr. Brown-Dressel's actions violated Moses-EL's constitutional rights. Though Moses-EL points to *Pierce* as support, we've held that *Pierce* "is limited to its factual context." *Kapinski v. City of Albuquerque*, 964 F.3d 900, 912 (10th Cir. 2020). That is, "an officer will lack immunity for omitting forensic hair and blood tests from an arrest warrant where those tests exculpate the subject of the warrant." *Id.* Moses-EL has not adequately alleged that Dr. Brown-Dressel falsified or omitted evidence. In fact, she has remained steadfast in her position that the test results cannot exclude Moses-EL as a suspect. Moses-EL has pointed to no case that suggests a forensic analyst's (allegedly incorrect) conclusions about test results would violate clearly established law.

[18] Moses-EL also alleges that even if Dr. Brown-Dressel believed her tests were inconclusive, she should still be liable for not insisting on DNA testing. *See* Joint App. Vol. 2 at 247. But Moses-EL fails to allege that in 1987, DNA testing was the normal practice. And in any event, "the police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988). Moreover, Moses-EL's defense team had the ability to do DNA testing before his first trial and forsook it.

prosecute Moses-EL a second time. Joint App. Vol. 2 at 310–11. We conclude again that he failed to plausibly allege malice.

Start with Moses-EL's allegation that Chief Deputy DA Benedetti and Investigator Carroll "threatened" Jackson into recanting his admission. The problem for Moses-EL is that the allegations he identifies to support this theory—that Jackson was read his *Miranda* rights and warned that he might be charged with perjury or other crimes based on his newfound admissions (while denying having raped T.S.)—suggest that Chief Deputy DA Benedetti and Investigator Carroll were correctly informing Jackson about the potential consequences of his admission. The allegations do not amount to "threatening" Jackson, and we cannot infer any malice on the part of Chief Deputy DA Benedetti and Investigator Carroll.[19]

Nor does Moses-EL plausibly allege that Chief Deputy DA Benedetti and Investigator Carroll acted with malice by "manufacturing" evidence to prosecute Moses-EL. Instead, Moses-EL merely alleges that these two defendants: (1) induced Howard to recollect a nonevent—T.S.'s contemporaneous identification of Moses-EL as her rapist, and (2) granted Burke immunity in exchange for her testimony. We address each allegation in turn.

---

[19] Nor can we infer malice based on Chief Deputy DA Benedetti's recommendation that Jackson be appointed counsel after his admission, as Moses-EL alleges. She correctly informed Jackson that his admission may implicate his Fifth Amendment right to self-incrimination and properly suggested that he speak with an attorney.

First, Moses-EL argues that Chief Deputy DA Benedetti and Investigator Carroll "induced" Howard's recollection of T.S.'s identification. Moses-EL points out that in 1987, Howard had failed to mention that T.S. identified him as the attacker. But Howard was later able to recall T.S., naming Moses-EL after visiting with Chief Deputy DA Benedetti and Investigator Carroll. But these allegations suggest that Chief Deputy DA Benedetti and Investigator Carroll were investigating T.S.'s attack and preparing for trial—not that they had maliciously "induced" Howard's memory. The added allegation that Howard was provided with a government-funded trip to Colorado to provide this testimony does not move the needle. Of course, the government would have to fly Howard in to testify at Moses-EL's trial. Nothing about that situation allows us to reasonably infer malicious intent.

Second, Chief Deputy DA Benedetti's decision to grant Burke immunity in exchange for her testimony also fails to plausibly show malice. Apart from alleging that Burke testified about an argument she had with Moses-EL on the night that T.S. was attacked, Moses-EL provides nothing else about Burke's testimony—let alone anything that would allow us to conclude that Chief Deputy DA Benedetti was acting maliciously.

In sum, the Amended Complaint lacks allegations that show malice on the part of Chief Deputy DA Benedetti and Investigator Carroll.[20]

---

[20] Further, Moses-EL's claims would fail on the second prong of the qualified-immunity analysis. For clearly established law, he cites only *Brady v. Maryland*, 373 U.S. 83 (1963) and *Pierce*. But, again, we can't define clearly established law at too high a level of generality. *See Mullenix*, 577 U.S. at 12. And, as explained above,

d.     *DA Morrissey*

The district court dismissed the malicious-prosecution claim against DA Morrissey, explaining that the only allegations raised against him related to his lobbying the Colorado legislature not to enact Colorado Senate Bill 08-205. The court concluded that such "legislative advocacy" wasn't the type of activity that could qualify as malicious prosecution. Joint App. Vol. 4 at 852. As the district court put it, "[b]y that measure, any other person who testified," "signed a petition," "or lobbied their representative" could have been alleged to have maliciously prosecuted Moses-EL. Joint App. Vol. 4 at 852. We agree and conclude that these allegations do not give rise to a constitutional violation.

But Moses-EL contends that the district court overlooked other acts of DA Morrissey, such as his failing to determine whether Jackson's blood type matched the DNA in T.S.'s rape kit and his taking "part in the malicious decision to force Plaintiff [to] run the gauntlet of trial a second time."[21] Opening Br. at 37–38. Neither allegation suggests that DA Morrissey acted with malice.

Start with DA Morrissey's decision to not independently "determine whether Mr. Jackson's blood type matched the evidence from the rape kit of T.S." Opening

we've already limited *Pierce*'s applicability "to its factual context." *Kapinski*, 964 F.3d at 912. Ultimately, neither *Brady* nor *Pierce* are factually analogous to our case, especially as it relates to Chief Deputy DA Benedetti and Investigator Carroll. So Moses-EL cannot rely on *Brady* or *Pierce* as clearly established law.

[21] The Amended Complaint does not allege Jackson's blood type.

Br. at 37. Moses-EL alleges that, in 2005, Denver law-enforcement officials obtained a "cold hit" matching Jackson to a different 1992 assault. Joint App. Vol. 2 at 266. Despite this match, DA Morrissey "made no effort" to determine whether Jackson's DNA would have also matched the evidence in Moses-EL's case. Joint App. Vol. 2 at 266. Even when drawing all inferences in Moses-EL's favor, we fail to see how not testing evidence from an *unrelated* case in a case that has already resulted in a *conviction* would show malice.

As for the decision to retry Moses-EL, the allegations suggest that DA Morrissey had a real and sufficient basis for arguing Moses-EL's guilt, enabling him to continue the prosecution without malice.[22]

In sum, the district court properly dismissed the malicious-prosecution claim against DA Morrissey.

### 3. Probable Cause

Before moving on, we address one other failed element of Moses-EL's malicious-prosecution claim: the lack of probable cause.

Probable cause exists when the totality of the circumstances would lead a "reasonable officer to believe that the person to be arrested has committed or is about to commit a crime." *Cortez*, 478 F.3d at 1116. When reviewing probable cause, we "examine the events leading up to the arrest, and then decide whether these historical

---

[22] DA Morrissey would be entitled to qualified immunity for the same reasons as Chief Deputy DA Benedetti and Investigator Carroll.

31

facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). The belief must be anchored in a "substantial probability," not just a "bare suspicion." *Id.* (quoting *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017)). But it "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (citations omitted).

Moses-EL argues several points favoring his view that the government lacked probable cause to prosecute him in 1988 and in 2016. More specifically, he alleges: (1) that no physical evidence tied him to T.S.'s rape; (2) that the attack occurred in the dark, depriving T.S. of a good look at the attacker; (3) that T.S. was "heavily intoxicated" from her night of drinking; (4) that T.S. was "severely nearsighted, but not wearing her glasses"; (5) that Moses-EL's hair did not match T.S.'s description as given to police; (6) that T.S. had listed three men from the party before accusing him; (7) that the only evidence tying Moses-EL to the attack was T.S's "dream-induced identification [of him] more than a day after the attack, when she was in the hospital on prescribed narcotics"; and (8) that Brown-Dressel's analysis of T.S.'s samples detected only blood type O and did not show any B antigens, even though Moses-EL was a B secretor.[23] Joint App. Vol. 2 at 237–39, 296.

---

[23] For the 2016 prosecution, Moses-EL also alleges that Chief Deputy DA Benedetti, Investigator Carroll, and DA Morrissey lacked probable cause because of Jackson's admissions.

But Moses-EL fails to acknowledge that a state judge would have found probable cause to allow his case to proceed to trial for his first and second prosecutions. *See* Colo. Rev. Stat. § 18-1-404(1) (stating that "every person accused" of certain crimes "has the right to demand and receive a preliminary hearing . . . to determine whether probable cause exists to believe that the offense charged . . . has been committed by the defendant"). We accord a judge's probable-cause finding "great deference." *United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). But we cannot evaluate these findings here because Moses-EL has not furnished the full bases presented to the state judge, or the grounds the judge relied on to find probable cause either time.[24] Nor does he argue that information was kept from the state judge as it evaluated probable cause. In short, he does not ask us to analyze the lack of probable cause by citing specific information that was falsified or excluded in an affidavit or at a preliminary hearing. *See Taylor*, 82 F.3d at 1563–64 (holding that a plaintiff had not demonstrated a lack of probable cause to support a malicious-prosecution claim because the plaintiff could not show that the defendant had "knowingly or with reckless disregard for the truth" omitted facts from an arrest warrant, or that the defendant had "somehow caused false or perjured testimony to be presented at the preliminary hearing"). Instead, Moses-EL seemingly wants us to reassess probable

---

[24] Moses-EL appears to allege that probable cause was based only on T.S.'s identification of him and Dr. Brown-Dressel's failure to exclude him.

cause based only on *his* identification and evaluation of the evidence. But a malicious-prosecution claim "deals with *judicial determinations* of probable cause, either at the warrant application stage or during a *Gerstein* hearing following a warrantless arrest."[25] *Wilkins*, 528 F.3d at 802 (emphasis in original). We are aware of no cases that would allow us to proceed as Moses-EL requests.

In addition, even if we somehow agreed with Moses-EL that his two prosecutions were unsupported by probable cause, he would still have to show that his constitutional rights were clearly established at the time of the alleged violation. *See Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). To determine whether the law was clearly established in this context, we ask if a defendant had "arguable probable cause" to pursue a plaintiff. *Id.* (citation omitted). Arguable probable cause exists when a defendant "in the same circumstances and . . . possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (citation and emphasis omitted). It is "another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014).

---

[25] When a person is arrested without a warrant, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). This is sometimes called a *Gerstein* hearing. *See Wilkins*, 528 F.3d at 802.

34

So for Moses-EL to succeed, he must show that all individual defendants lacked even arguable probable cause to prosecute him. To do so, he must put forth controlling precedent from the Supreme Court or our circuit that "squarely governs the case here" and puts the constitutional issue "beyond debate." *Garcia v. Escalante*, 678 F. App'x 649, 656 (10th Cir. 2017) (quoting *Mullenix*, 577 U.S. at 13).

Moses-EL has failed to satisfy this burden. Indeed, he has not identified *any* analogous case that would suggest that there was no arguable probable cause to prosecute, given T.S.'s eyewitness identification. We have explained that "the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy."[26] *Cortez*, 478 F.3d at 1121. Though Moses-EL points to several issues with T.S.'s identification, those problems do not preclude a finding of arguable probable cause, even when taking all inferences in Moses-EL's favor. In fact, in *Easton*, we held that inconsistent statements from two potential victims of sexual assault (one who was three years old and the other who was five years old) still sufficiently supplied probable cause. 776 F.2d at 1450–51 ("Evidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefor difficult of belief." (citation

---

[26] We also note that in resolving whether probable cause exists, "the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness." *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985).

omitted)). Thus, the law was not clearly established such that no reasonable officer would've believed that probable cause was lacking to prosecute Moses-EL.

At bottom, Moses-EL's allegations do not suffice to plausibly allege a lack of probable cause to support his malicious-prosecution claims.

### B.      Destruction of Exculpatory Evidence

Moses-EL's second claim alleges that Detective Huff had a constitutional obligation under the Fourteenth Amendment to preserve exculpatory evidence related to Moses-EL's case and that he acted "recklessly, knowingly, intentionally, willfully, and wantonly" by destroying this evidence and failing to independently test it. *See* Joint App. Vol. 2 at 313.

The Due Process Clause of the Fourteenth Amendment requires a showing of "bad faith on the part of the police" when evidence of "potentially" exculpatory value is destroyed. *See Youngblood*, 488 U.S. at 57–58 (1988) (explaining the Court's "unwillingness" to hold that the Due Process Clause imposes "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution").

Here, we first note that the evidence from T.S.'s rape wasn't conclusively "exculpatory." Though Moses-EL repeatedly characterizes it as such, neither party ever tested it. Thus, it was still only "potentially" exculpatory. *See id.* at 58. So Moses-EL must allege that Detective Huff acted in bad faith when he ordered the evidence's destruction. He cannot do so because the timing of events shows that Detective Huff's conduct was—at most—negligence.

36

As alleged by Moses-EL, in November 1993, Detective Huff was informed that the evidence had been reentered into the Denver Police Department's Property Bureau for upcoming DNA analysis. Then in July 1995, Perry made a computer entry for the evidence stating: "HOLD FOR DA WHITLEY." Joint App. Vol. 2 at 253, 255. Yet contrary to practice, no one notified Detective Huff that he needed to preserve the evidence. Then, in October 1995, Detective Huff marked the evidence for disposal after missing the notation to hold the evidence. In short, almost two full years elapsed between Detective Huff being told that the evidence had been placed in the Denver Police Department's Property Bureau and when he marked it for destruction. The only reasonable inference from that fact is that the evidence's disposal was based on negligence, not malice.

And notably, the evidence was available for Moses-EL to retrieve—for over a month. If anyone in the Denver Police Department, including Detective Huff, was serious about intentionally destroying this evidence, he or she would not have given Moses-EL weeks to obtain it. Thus, we cannot conclude that the evidence's disposal stemmed from anything more than negligence. And negligence by a state official can't support a due-process violation under the Fourteenth Amendment. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986).

Likewise, Detective Huff's failure to independently "test" the evidence can't plausibly constitute "bad faith" or a "reckless disregard for the truth" as needed to allege a due-process violation. This is because "the police do not have a constitutional duty to perform any particular test." *Youngblood,* 488 U.S. at 59.

37

At bottom, Moses-EL hasn't plausibly pleaded a Fourteenth Amendment claim against Detective Huff and the Estate for destruction of evidence.

## C. Manufacturing False Inculpatory Evidence

Moses-EL's third claim alleges that Chief Deputy DA Benedetti and Investigator Carroll violated Moses-EL's Fourteenth Amendment substantive-due-process rights by manufacturing false inculpatory evidence. Again, Moses-EL bases this claim on three alleged acts: (1) "intimidating" Jackson into recanting his admission; (2) persuading Howard to falsely recall and testify that T.S. identified Moses-EL on the night of the attack; and (3) improperly providing Burke immunity to overcome her testimonial privilege. Joint App. Vol. 2 at 315–16.

To state a fabrication-of-evidence claim under the Fourteenth Amendment, a plaintiff must allege: "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021).

For the same reasons as we outlined in the malicious-prosecution section, we conclude that Moses-EL hasn't alleged that Chief Deputy DA Benedetti and Investigator Carroll "knowingly fabricated evidence." *See id.* First, the allegations don't support the inference that Chief Deputy DA Benedetti and Investigator Carroll "threatened" Jackson when they informed him of the possible consequences of

38

testifying. Second, the allegations don't support the inference that Chief Deputy DA

Benedetti and Investigator Carroll induced Howard to recall that T.S. identified

Moses-EL as her attacker. Finally, Chief Deputy DA Benedetti's decision to grant

Burke immunity to overcome her testimonial privilege doesn't support the inference

that Benedetti "fabricated" evidence, particularly when Moses-EL never even alleged

that Burke's testimony was false.[27]

As a result, the district court properly dismissed this manufacturing-of-

evidence claim against Chief Deputy DA Benedetti and Investigator Carroll.

### D.    Fundamental Unfairness of Prosecutions

Moses-EL's sixth claim—though labeled as a procedural- and substantive-due-

process claim—in substance asserts a substantive-due-process violation against all

defendants. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (explaining

that the Fourteenth Amendment's guarantee of substantive due process protects "the

individual against arbitrary action of government" whether that comes from "a denial of

fundamental procedural fairness . . . or in the exercise of power without any reasonable

justification").

"The 'ultimate' standard for determining whether there has been a substantive due

process violation is 'whether the challenged government action shocks the conscience of

---

[27] He alleges only that Chief Deputy DA Benedetti tried to use Burke's testimony to support "Defendant Benedetti's fabricated theory that Ms. Burke had directed Mr. Moses-EL to commit crimes against T.S. on the night she was attacked." Joint App. Vol. 2 at 295.

federal judges.'" *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002)). This standard is greater than intentionality or reckless disregard for the truth. *Becker v. Kroll*, 494 F.3d 904, 922–23 (10th Cir. 2007). Thus, it is reserved for only "the most egregious official conduct." *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). Further, the Supreme Court has cautioned against expanding the scope of substantive due process. *See id.* at 842. And as a result, we recognize § 1983 claims for substantive-due-process violations only "in the narrowest of circumstances." *Becker*, 494 F.3d at 922.

As conscience-shocking conduct, Moses-EL lists, without specifying a defendant: (1) destroying exculpatory evidence; (2) systematically withholding exculpatory evidence about the true perpetrator; (3) systematically manufacturing inculpatory evidence; (4) refusing to investigate other viable suspects; (5) misleading prosecutors about conclusions that could have been drawn from serological testing; (6) taking "affirmative steps" to deny Moses-EL access to potential remedies based on the destruction of exculpatory evidence; (7) conspiring to fabricate probable cause; (8) continuing to confine Moses-EL despite evidence pointing to his innocence; (9) inadequate supervision "to prevent the above constitutional violations"; and (10) failing to establish policies customs, or practices "to prevent the above constitutional violations." Joint App. Vol. 2 at 322–23.

The district court dismissed this entire claim because it was duplicative of the claims that were already dismissed. On appeal, Moses-EL argues only that he "has stated a substantive-due-process claim against all individual Defendants." Opening

Br. at 39.

But like the district court, we also conclude that Moses-EL has not plausibly alleged that any of these purported actions amounted even to malicious conduct. Thus, they cannot "shock the conscience." So we affirm the district court's dismissal of this claim.

### E.    Civil Conspiracy

Moses-EL alleges a civil conspiracy between DA Morrissey, Chief Deputy DA Benedetti, and Investigator Carroll to continue prosecuting Moses-EL, even though they knew the evidence suggested his innocence. He further alleges that these defendants tried to cover up the errors in the 1987 investigation and agreed to spread lies about the 1987 crime.

The district court dismissed this claim after noting the lack of allegations pertaining to any agreement between DA Morrissey, Chief Deputy DA Benedetti, and Investigator Carroll. It reasoned that it was unclear how DA Morrissey's opposition to the legislative bill had anything to do with Chief Deputy DA Benedetti and Investigator Carroll's interactions with Howard or Jackson. And it concluded that, in any event, Moses-EL hadn't "identified any constitutional deprivations committed by any of the identified Defendants that would support his conspiracy claim." Joint App. Vol. 4 at 860.

We agree. A plaintiff asserting a § 1983 conspiracy claim must plead that he was (1) deprived of a constitutional right (2) by a conspiracy comprised of or including conspirators acting under color of state law. *See Dixon v. City of Lawton*,

41

898 F.2d 1443, 1449 (10th Cir. 1990). Both elements are essential. *Id.* Indeed, the "essence of a § 1983 claim is the deprivation of the right rather than the conspiracy." *Id.* (citation omitted). For this reason, Moses-EL's failure to plausibly plead the deprivation of a constitutional right dooms this claim. *See Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995). The district court thus properly dismissed Moses-EL's civil-conspiracy claim.

### F.    Municipal Liability

Moses-EL alleges that Denver violated his Fourteenth Amendment rights through various unconstitutional customs, policies, and supervision practices that amounted to a deliberate disregard of the search for the truth. His general allegations fall into these categories: (1) making false statements to legislators; (2) fabricating evidence; (3) pursuing malicious prosecutions to cover up wrongful convictions and wrongdoing of its officials; (4) systematically mishandling, destroying, or losing evidence; (5) failing to communicate with the DA's Office to ensure the proper preservation of evidence; (6) failing to adequately train and supervise personnel in its forensic laboratory; and (7) establishing no standard operating procedures or formal scientific analytical methods for serological testing. Joint App. Vol. 2 at 317–19. Moses-EL also argues that Detective Huff, while serving as the "municipal policymaker," caused the biological evidence in Moses-EL's case to be destroyed, the liability for which can be imputed to Denver. *See* Opening Br. at 47.

To state a plausible claim against an institutional defendant, a plaintiff must allege: (1) a policy or custom; (2) that caused the deprivation of a plaintiff's

constitutional rights; and (3) that the municipality acted with deliberate indifference. *See Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020).

As already explained, Moses-EL has not plausibly alleged any constitutional claim that Denver fabricated, destroyed, or systematically mishandled evidence; that he was maliciously prosecuted; or that Denver was ever aware that its labs and testing procedures were deficient in Moses-EL's case. Nor do any of these allegations amount to an official custom or policy, or suggest that Denver acted with deliberate indifference.[28] So none of Moses-EL's allegations can support a claim against Denver. *See Crowson v. Washington Cnty.*, 983 F.3d 1166, 1186 (10th Cir. 2020) ("[A] claim under § 1983 against either an individual actor or a municipality cannot survive a determination that there has been no constitutional violation.").

Thus, Moses-EL has not adequately alleged a municipal-liability claim against Denver.[29]

---

[28] Deliberate indifference requires Moses-EL to allege that Denver was on "actual or constructive notice" that its policies or customs were substantially certain to cause constitutional violations, and that Denver still deliberately chose to disregard that risk. *See Schneider v. Grand Junction Police Dep't*, 717 F.3d 760, 771 (10th Cir. 2013) (citation omitted). He has not done so.

[29] We reject Moses-EL's attempt to establish municipal liability by alleging that Detective Huff was a final policymaker. "Whether an official has final policymaking authority in a particular area is a question of state law." *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989). Yet Moses-EL identifies no state law relating to Detective Huff's authority. The only basis for Moses-EL's argument is that Detective Huff had final say over whether evidence was preserved or destroyed. But the "mere exercise of discretion by a county official is not sufficient, by itself, to generate municipal liability." *Id.*

### G.    Supervisory-Liability Claim

Finally, Moses-EL alleges a claim of supervisory liability for inadequate screening, training, supervision, and discipline of employees at the DA's Office against DA Morrissey. The district court dismissed this claim, finding that there was no constitutional violation by anyone in the DA's Office under DA Morrissey's supervision.

We agree. As discussed earlier, Moses-EL hasn't pleaded any viable constitutional violations by Chief Deputy DA Benedetti or Investigator Carroll, the only remaining defendants against whom this claim is alleged. Thus, DA Morrissey, as their supervisor, can't be held liable under § 1983. *See Doe v. Woodard*, 912 F.3d 1278, 1290 (10th Cir. 2019).

## IV.    Moses-EL's Post-Dismissal Motions

### A.    Motion to Alter: Rule 59(e)

We turn now to the denial of Moses-EL's motion to alter under Rule 59(e), which we review for abuse of discretion. *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1275 (10th Cir. 2005). A district court "abuses its discretion if it made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *ClearOne Commc'ns v. Biamp Sys.*, 653 F.3d 1163, 1178 (10th Cir. 2011) (citation and internal quotations omitted).

44

Generally, a Rule 59(e) motion may be granted only if the plaintiff identifies: (1) an intervening change in controlling law; (2) new evidence previously unavailable; or (3) the need to correct clear error or prevent manifest injustice. *Hayes Fam. Trust v. State Farm Fire & Cas. Co.*, 845 F.3d 997, 1004 (10th Cir. 2017). "It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

In this case, after the district court entered final judgment for defendants, Moses-EL moved to alter the judgment. He argued that the court misapplied the pleading standards established in *Iqbal* and *Twombly* and dismissed plausibly pleaded claims.

In its order denying Moses-EL's motion to alter, the district court first clarified that it hadn't imposed a probability requirement but recognized that under *Iqbal* and *Twombly*, "it is not sufficient for a plaintiff to plead facts that are merely consistent with a defendant's liability." Joint App. Vol. 6 at 1261 (internal quotation marks omitted) (citing *Iqbal*, 556 U.S. at 678). In other words, because Moses-EL's allegations could more readily be explained in ways that did not impute liability on any defendant, the court reasoned that Moses-EL hadn't nudged his claims across the line from conceivable to plausible (citation omitted). The court then reviewed each ruling that Moses-EL challenged and reiterated why it concluded that Moses-EL hadn't met his pleading burdens on each one.

45

We see no abuse of discretion in the district court's denial of Moses-EL's motion. Moses-EL didn't identify any change in controlling law or any material new evidence that he couldn't have apprised the court of earlier, as required for such a motion. Instead, Moses-EL merely disagreed with the district court's Rule 12(b)(6) analysis. But a Rule 59(e) motion is an inappropriate vehicle to renew arguments. *See Servants of Paraclete*, 204 F.3d at 1012.

### B.    Motion for Leave to Amend: Rule 15(a)

We review the denial of leave to amend a complaint for an abuse of discretion. *Cohen v. Longshore*, 621 F.3d 1311, 1313 (10th Cir. 2010). But when a denial is based on futility, we review de novo the finding of futility. *Miller ex rel. Sm.M. v. Bd. of Educ.*, 565 F.3d 1232, 1249 (10th Cir. 2009).

Moses-EL sought to amend his complaint to cure his pleading deficiencies *after* the district court had entered a final judgment. As a result, the district court ruled that Moses-EL had to "show that the judgment should first be vacated under Rule 59(e) or Rule 60(b) standards, then show that leave to amend [was] warranted under Rule 15." Joint App. Vol. 6 at 1271. Because the district court concluded that Moses-EL hadn't demonstrated that his judgment should be vacated under Rule 59(e), it denied his motion for leave to amend. We see no abuse of discretion in the district court's ruling.

But the district court also ruled that, even on the merits, Moses-EL's motion was futile. The court held that despite the allegations added into the proposed second

amended complaint, none of them "would suffice to cure the specific deficiencies discussed in [its] prior Opinion and Order." Joint App. Vol. 6 at 1272.

We agree that Moses-EL's proposed amendments would have been futile. For example, none of them plausibly show that any defendant acted with malice. *See* Joint App. Vol. 5 at 939–44 (maintaining that Detective Huff testified that he was "*unaware* that the case was active" when he ordered a technician to destroy the T.S. attack evidence) (emphasis added)). Likewise, Moses-EL has not plausibly alleged that Chief Deputy DA Benedetti or Investigator Carroll induced any witnesses to fabricate their testimony. *See* Joint App. Vol. 5 at 970–71, 995, 1104–05, 1010 (reiterating speculative *conclusions* that Investigator Carroll and Chief Deputy DA Benedetti secured false statements from Jackson, Howard, and Burke but adding no plausible facts to support that the statements were "fabricated"). In sum, none of the newly proposed allegations would change the case's result.

Thus, we affirm the district court's denial of Moses-EL's motion for leave to amend.

## CONCLUSION

For these reasons, we affirm.

Entered for the Court

Gregory A. Phillips
Circuit Judge